# United States Court of Appeals for the Federal Circuit

---

**AMERICAN BANKERS ASSOCIATION, WASHINGTON FEDERAL, N.A., INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2018-1341

---

Appeal from the United States Court of Federal Claims in No. 1:17-cv-0194-SGB, Senior Judge Susan G. Braden.

---

Decided: August 8, 2019

---

STEPHEN JOSEPH OBERMEIER, Wiley Rein LLP, Washington, DC, argued for plaintiffs-appellants. Also represented by CLAIRE J. EVANS, MICHAEL E. TONER.

ERIC PETER BRUSKIN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by JOSEPH H. HUNT, ROBERT E. KIRSCHMAN, JR., KENNETH M. DINTZER, CLAUDIA BURKE; KATHERINE H.

WHEATLEY, Board of Governors of the Federal Reserve System, Washington, DC.

————————————

Before WALLACH, CHEN, and HUGHES, *Circuit Judges.*

HUGHES, *Circuit Judge.*

This case arises out of legislation amending the statutory rate for dividend payments on Federal Reserve Bank stock. The Federal Reserve Act of 1913 set the dividend rate at six percent per year, which remained in effect until Congress amended the dividend provision in 2016. The amendment effectively reduced the dividend rate for certain stockholder banks from the fixed six percent rate to a lower variable rate. American Bankers Association and Washington Federal, N.A. sued the United States in the Court of Federal Claims, arguing that banks who subscribed to Reserve Bank stock before the amendment are entitled to dividends at the six percent rate. The complaint alleged that, by paying dividends at the amended statutory rate, the United States breached a contractual duty or, in the alternative, effected a Fifth Amendment taking. The trial court dismissed the complaint under Rules of the U.S. Court of Federal Claims 12(b)(6) for failure to state a claim. American Bankers and Washington Federal now appeal. Because the complaint does not allege facts establishing the existence of a contract or an unconstitutional taking, we affirm.

I

A.

We begin with a brief overview of the Federal Reserve System and its statutory origins. The Federal Reserve Act

of 1913, Pub. L. No. 63–43, ch. 6, 38 Stat. 251 (1913),[1] established a system to oversee banking operations and promote greater economic stability.  The Federal Reserve System includes the Federal Reserve Board of Governors, *see id.*, §§ 10–11, 38 Stat. 260–63, and twelve regional Reserve Banks, *see id.* § 2, 38 Stat. 251–52.  The Board exercises broad regulatory supervision over the Reserve Banks, which serve as banks to the U.S. government and to commercial banks who are members of the Federal Reserve System.

The Act sets forth the conditions under which commercial banks may join the Federal Reserve System.  One of the conditions of membership is that member banks must "subscribe" to the stock of their regional Reserve Bank in an amount "equal to six per centum of the paid-up capital stock and surplus of [the] applicant bank . . . ." § 5, 38 Stat. 257.  Every national bank[2] is required to join the system and subscribe to Reserve Bank stock.  § 2, 38 Stat 252.  Other financial institutions, such as state banks, are permitted but not required to apply for membership and subscribe to stock.  § 9, 38 Stat. 259.

Reserve Bank stock is "divided into shares of $100," which "shall not be transferred or hypothecated." § 5, 38 Stat. 257.  From 1913 to 2015, the Act provided that "the stockholders of the [Reserve] bank shall be entitled to

---

[1]    The Federal Reserve Act is codified as amended in scattered sections of Chapter 3 of Title 12 of the United States Code.  *See* 12 U.S.C. §§ 221–522.  This opinion cites to the original 1913 Act, which is the same as the current version except where otherwise noted.

[2]    A national bank refers to a commercial bank chartered by the federal government under the National Bank Act.  *See* 12 U.S.C. § 21 et seq.

receive an annual dividend of six per centum on the paid-in capital stock . . . ." § 7, 38 Stat 258.

On December 4, 2015, Congress passed the Fixing America's Surface Transportation Act (FAST Act), which authorized substantial appropriations for surface transportation infrastructure. *See* Pub. L. No. 114–94, 129 Stat. 1312. The FAST Act included an amendment to the statutory dividend rate for Reserve Bank stock owned by member banks with consolidated assets of more than $10 billion. Under the amended dividend provision, these banks would receive a variable dividend rate equal to the lesser of: (1) the rate of the 10-year Treasury note or (2) six percent. *See* § 32203, 129 Stat. 1739 (codified as amended at 12 U.S.C. § 289(a)(1)).

B.

Prior to 2013, Washington Federal operated as a federally chartered savings and loan association. On May 29, 2013, Washington Federal received approval from the Office of the Comptroller of the Currency to convert to a national bank, contingent on, *inter alia*, Washington Federal applying for membership in the Federal Reserve System.

On July 8, 2013, Washington Federal submitted an application for Reserve Bank stock to the Reserve Bank of San Francisco (BSF). A letter from BSF, dated July 17, 2013, informed Washington Federal that its application and payment for stock had been processed and enclosed an Advice of Holdings for 479,610 shares of BSF stock. The letter further noted that "[d]ividends are paid at the statutory rate of 6 percent per annum, or $1.50 per share semiannually." J.A. 65.

From 2013 to 2015, Washington Federal received dividend payments on its stock at a rate of six percent per year. After the FAST Act took effect on January 1, 2016, Washington Federal received dividends at the rate of the 10-year Treasury note. In 2016, Washington Federal received

dividends totaling $502,471.53, reflecting an annual rate of approximately two percent.

## C.

Washington Federal and American Bankers Association[3] filed a complaint against the United States in the Court of Federal Claims on February 9, 2017.[4] The complaint alleged that, by paying dividends at a rate lower than six percent in 2016, the government breached a contractual duty to member banks that subscribed to Reserve Bank stock before December 4, 2015. The complaint also asserted, in the alternative, that the government's conduct effected a Fifth Amendment taking.

The government filed a motion to dismiss for lack of standing under RCFC 12(b)(1) and failure to state a claim under RCFC 12(b)(6). The Court of Federal Claims determined that American Bankers failed to meet the requirements for associational standing because the damages requested would require individualized proof for each association member. The court found that Washington Federal had standing but dismissed all counts of the complaint under RCFC 12(b)(6) for failure to state a claim. Washington Federal and American Bankers now appeal the court's dismissal of the claims and its standing determination. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

---

[3] American Bankers Association is a national trade association for the banking industry. Its members include Washington Federal, as well as other banks affected by the amendment to the dividend rate, i.e., member banks with more than $10 billion in consolidated assets.

[4] The complaint was subsequently amended on April 14, 2017. This opinion refers to the amended complaint unless otherwise stated.

II

We review de novo whether the Court of Federal Claims properly dismissed a complaint for failure to state a claim upon which relief may be granted. *Frankel v. United States*, 842 F.3d 1246, 1249 (Fed. Cir. 2016). To avoid dismissal under RCFC 12(b)(6), a plaintiff "must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." *Acceptance Ins. Cos., Inc. v. United States,* 583 F.3d 849, 853 (Fed. Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a motion to dismiss, we accept as true the complaint's well-pled factual allegations; however, we are not required to accept the asserted legal conclusions. *Id.*

For the reasons set forth below, we conclude that the trial court did not err in dismissing Washington Federal's breach of contract and takings claims under RCFC 12(b)(6).[5]

A.

First, we address Washington Federal's breach of contract claim. The complaint asserts that the government breached an implied-in-fact or express contract with Washington Federal by paying dividends at a rate lower than six percent in 2016. Washington Federal alleges that an implied-in-fact contract exists because the Federal Reserve Act constitutes an offer by the government, which

---

[5] We need not reach American Bankers' standing argument because American Bankers' allegations are the same as Washington Federal's and would thus share the same flaws regardless of our outcome.

Washington Federal accepted by submitting its application and payment for Reserve Bank stock. Alternatively, Washington Federal contends that an express contract was formed based on its application for stock, which was a contractual offer that the government accepted by approving the application and issuing stock.

There are four requirements to form a contract binding upon the government: "(1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract." *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003). These requirements apply to both express and implied-in-fact contracts. *Id.* at 1353 n.3. "To satisfy its burden to prove such a mutuality of intent, a plaintiff must show, by objective evidence, the existence of an offer and a reciprocal acceptance." *Id.*

For both its implied-in-fact and express contract theories, Washington Federal relies largely on the Federal Reserve Act as evidence of the government's intent to contract. Under its implied-in-fact contract theory, the Act was an offer to contract; under its express contract theory, the Act was an invitation to receive offers to contract. Under either theory of contract formation, Washington Federal argues that the Act contemplates a contractual agreement between member banks and the government. Because Washington Federal failed to allege facts establishing the existence of a contract with the government, we determine that the trial court did not err in dismissing this claim.

1.

"[A]bsent some clear indication that the legislature intends to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'" *Nat'l R.R.*

*Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465–66 (1985) (quoting with alterations *Dodge v. Bd. of Educ.*, 302 U.S. 74, 79 (1937)). This "well-established presumption" reflects a recognition that "the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state." *Id.* And "[p]olicies, unlike contracts, are inherently subject to revision and repeal . . . ." *Id.*

To overcome the presumption, there must be a "clear indication" that the legislature intended to create contractual rights enforceable against the government. *Id.* at 465–66. The Supreme Court has recognized evidence of an intent to contract where a statute "provide[s] for the execution of a written contract *on behalf of the United States*" or "speak[s] of a contract" with the United States. *Id.* at 467 (emphasis in original); *see also Dodge*, 302 U.S. at 78; *Indiana ex rel. Anderson v. Brand*, 303 U.S. 95, 105 (1938). For example, in *Hall v. Wisconsin*, 103 U.S. 5 (1880), the statute provided for a geological, mineralogical, and agricultural survey to be carried out by commissioners appointed by the governor. *Id.* at 5–6. The statutory text directed the governor to "make a written contract with each of the commissioners . . . expressly stipulating and setting forth the nature and extent of the services to be rendered by each, and the compensation therefor . . . ." *Id.* at 8–9. Likewise, in *Indiana ex rel. Anderson*, the Court found that Indiana's Teachers' Tenure Law contemplated contracts binding on the state, noting that "[t]he title of the act is couched in terms of contract" and the text "speaks of the making and canceling of indefinite contracts" between teachers and school districts. 303 U.S. at 105.

In finding that a statute or regulation constitutes an offer to enter into a unilateral contract, courts have also relied on explicit references to contractual undertakings. For example, in *Radium Mines, Inc. v. United States*, 153 F. Supp. 403 (Ct. Cl. 1957), the regulation at issue included a section entitled "Purchase Contract," which stated that,

if a sample of uranium delivered to the Commission "meet[s] the conditions of this section, the Commission will forward to the person making the offer a form of contract containing applicable terms and conditions ready for his acceptance." *Id*. at 405. Similarly, the statutory provision in *Grav v. United States*, 14 Cl. Ct. 390 (1988), *aff'd*, 886 F.2d 1305 (Fed. Cir. 1989), provided that "[t]he Secretary shall offer to enter into a contract" with milk producers. *Id*. at 392.

In contrast, the Supreme Court determined in *Dodge* that the Miller Law did not clearly express the government's intent to contract. 302 U.S. at 80. As originally enacted, the Miller Law established a compulsory retirement age for public school teachers and provided for the payment of annuities to retired teachers. *Id*. at 76. The law stated that teachers "who served in the public schools of such city for twenty or more years prior to such retirement, shall be paid the sum of fifteen hundred dollars ($1,500.00) annually and for life from the date of such retirement . . . ." *Id*. Nearly ten years after it was passed, the Miller Law was amended to reduce annuity payments to $500 for all retired teachers, including those who had retired prior to the amendment. *Id*. at 77. The teachers who filed suit against the Board of Education argued that they were contractually entitled to annuity payments at $1,500 because the Miller Law constituted an offer to contract, which they had accepted by remaining in service for at least twenty years. *Id*. at 77. The Supreme Court rejected this argument, concluding that neither the statutory language nor the circumstances of enactment indicated a legislative intent to create binding contractual obligations. *Id*. at 79–81.

### 2.

To determine whether a statute gives rise to a contractual obligation, we first look to the language of the statute. *See Dodge,* 302 U.S. at 78; *Nat'l R.R.*, 470 U.S. at 466. The language of the Federal Reserve Act is devoid of the

traditional indicia of a contractual undertaking. The Act does not "speak of a contract" between Reserve Banks and member banks; nor does it "provide for the execution of a written contract on behalf of the United States." *See Nat'l R.R.*, 470 U.S. at 467. Rather, the Act sets forth a regulatory system, in which member banks are granted certain "powers and privileges" and are subject to specified "duties, liabilities, and regulations." § 8, 38 Stat. 259. Among the duties, member banks are "required . . . to subscribe to the capital stock" of their regional Reserve Bank. § 2, 38 Stat. 252. Among the privileges, banks "shall be entitled to receive an annual dividend of six per centum on the paid-in capital stock. . . ." § 7, 38 Stat. 258.

Washington Federal urges us to discern contractual intent from the terms "subscribe" and "subscription," which it contends are "contractual terms of art in the context of stock offerings. . . ." Appellant's Op. Br. 31; *see also id.* at 32–33. But we must interpret the language in the context in which it is written. In the context of a regulatory statute, we will not infer a contractual undertaking "absent 'an adequate expression of an actual intent' of the State to bind itself. . . ." *Nat'l R.R.*, 470 U.S. at 466–67 (quoting *Wis. & Mich. Ry. Co. v. Powers*, 191 U.S. 379, 386–87 (1903)). And the use of terminology that carries contractual connotations when used in the private sector does not, on its own, establish such intent. For example, in *Dodge*, the Supreme Court rejected appellants' argument that "annuity" is "terminology based on contract" that reflected the legislature's intent to establish contractual rights. 302 U.S. at 81. Likewise, we find that the subscription language in the Federal Reserve Act does not unequivocally express the government's intent to bind itself in contract.

Washington Federal further argues that the government's intent to contract is evident from the exchange of obligations between member banks and Reserve Banks. According to Washington Federal, the Act contemplates an agreement that Reserve Banks will pay member banks an

annual dividend of six percent in exchange for member banks' subscription to Reserve Bank stock. The language and structure of the Act, however, do not reflect a bargained-for quid pro quo between two parties. The dividend rate is set forth in an entirely different section than the provisions governing stock subscription. *Compare* § 7, 38 Stat. 258, *with* § 2, 38 Stat. 251–52, *and* § 5, 38 Stat. 257–58. Moreover, the Act does not frame dividend payments as a contractual obligation of the Reserve Banks. Rather, the six percent dividend is described as a benefit that member banks "shall be entitled to receive." § 7, 38 Stat. 258. And a statute does not create contractual obligations merely by setting forth "benefits to those who comply with its conditions." *Wis. & Mich, Ry. Co.*, 191 U.S. at 387. Indeed, in *Dodge*, the statutory language provided that teachers who retired after serving twenty or more years in the public schools "shall be paid the sum of fifteen hundred dollars ($1,500.00) annually and *for life* from the date of such retirement . . . ." 302 U.S. at 76 (emphasis added). Yet the Supreme Court declined to find that the teachers' rights to $1,500 annuity payments vested upon meeting the statutory conditions. *Id.* at 77, 79–81. Similarly, we conclude that the Federal Reserve Act does not demonstrate the government's clear intent to confer vested contractual rights on each member bank who complies with the stock subscription requirement.

The circumstances surrounding the passage of the Federal Reserve Act and its legislative history offer further support. *See Nat'l R.R.*, 470 U.S. at 468. The Federal Reserve Act was passed in 1913 in response to ongoing instability within the financial sector, which had given rise to a series of banking crises in the preceding decades. *See* H.R. Rep. No. 63-69, at 3–5 (1913). One of the deficiencies of the banking system at the time was that it "fail[ed] to afford any safeguard against panics and commercial stringencies or any means of alleviating them." *Id.* at 6.

Congress created the Federal Reserve System to prevent and contain the financial disruption caused by bank failures. The Reserve Banks were intended to serve as lenders of last resort by maintaining a reserve of liquid capital "ready for use in protecting the banks of any section of the country and for enabling them to go on meeting their obligations instead of suspending payments, as so often in the past." *Id.* at 11; *see also id.* at 19–22. To provide the funds for this reserve, Congress established the requirement that member banks subscribe to Reserve Bank stock. *Id.* at 16–17, 20–21. Thus, the origins of the subscription requirement reflect a regulatory effort to promote stability in the banking system through collaboration, rather than a collection of private contractual undertakings.

Statements in the legislative history bear this out. For example, the House Report accompanying the bill later passed as the Federal Reserve Act, expressed the view that "banking institutions which desire to be known by the name 'national' should be required, and can well afford, to take upon themselves the responsibilities involved in joint or federated organization." *Id.* at 16. Likewise, the Senate Report stated that the Reserve Banks were "not intended to be merely money-making banks," but "guardians of the public welfare, primarily safeguarding the member banks, protecting their reserves, safeguarding their credit, [and] protecting them from panic or financial stringency. . . ." S. Rep. No. 63-133, at 10 (1913). Although the proposed legislation was to provide member banks with a return on the use of their funds, the Senate Report noted that "the stability of the business of the bank, and the peace of mind it will give to the bankers in having freedom from constant anxiety, would more than compensate them, even if the financial advantages did not do so." *Id.* at 12.

Accordingly, we discern no "clear indication" of the government's intent to contract in either the language of the Federal Reserve Act or the circumstances under which it was passed.

The additional evidence on which Washington Federal relies, primarily for its express contract theory, does nothing to remedy this deficiency.  For example, the July 17, 2013 letter from the BSF merely states that Washington Federal's application and payment have been processed and informs Washington Federal of some of the obligations and benefits associated with membership in the Federal Reserve System.  Washington Federal points to the letter's statement that "[d]ividends are paid at the statutory rate of 6 percent per annum, or $1.50 per share semi-annually." J.A. 65.  But this is simply a statement of policy based on the statutory dividend rate in effect at the time, not the language of a promise or contractual undertaking.  *See Chattler v. United States*, 632 F.3d 1324, 1330 (Fed. Cir. 2011) ("[T]he obligation of the government, if it is to be held liable, must be stated in the form of an undertaking, not as a mere prediction or statement of opinion or intention. Likewise statements of information or definition are not statements of obligation." (internal citations and quotation marks omitted)).

Because Washington Federal did not plead facts sufficient to establish the government's intent to contract, the complaint fails to state a plausible claim for breach of contract.  Accordingly, this claim was properly dismissed.[6]

---

[6]    Washington Federal's claim for breach of implied duty of good faith and fair dealing likewise depends on the existence of a valid contract.  *See Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005) ("The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner."). Therefore, this claim was also properly dismissed.

B.

We now turn to Washington Federal's Fifth Amendment takings claim. The complaint sets forth two takings theories: (1) by enacting the FAST Act, the government deprived Washington Federal of its "property interest[] in the promised six percent dividend," J.A. 57 ¶ 92; and (2) by paying dividends at a rate lower than six percent, the government effected "a taking of [Washington Federal's] capital investment[] in Federal Reserve Bank stock without just compensation in the form of a market return on the invested capital," J.A. 57 ¶ 93. Under either theory, Washington Federal failed to state a plausible takings claim.

To state a claim for a taking under the Fifth Amendment, a plaintiff must identify a legally cognizable property interest. *Tex. State Bank v. United States*, 423 F.3d 1370, 1378 (Fed. Cir. 2005). "The Constitution neither creates nor defines the scope of property interests compensable under the Fifth Amendment." *Conti v. United States*, 291 F.3d 1334, 1340 (Fed. Cir. 2002) (citing *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 577 (1972)). Property interests arise from "existing rules and understandings and background principles derived from an independent source, such as state, federal, or common law. . . ." *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1213 (Fed. Cir. 2005) (internal quotation marks omitted). To support a takings claim, a property interest must be more than a "mere unilateral expectation or an abstract need." *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980).

Under its first takings theory, Washington Federal asserts a property interest in its "contractual and statutory rights to receive a six percent dividend on Federal Reserve Bank stock . . . ." J.A. 57 ¶ 90. While contract rights are a form of property that may be compensable under the Fifth Amendment, *see Cienega Gardens v. United States*, 331 F.3d 1319, 1329–30 (Fed. Cir. 2003), the complaint does not

establish that Washington Federal had a contractual right to a six percent dividend, *see supra* Section II.A.2. Thus, the trial court properly dismissed the contract-based takings claim.

Likewise, Washington Federal has not alleged a legally cognizable property interest arising from its "statutory rights" under the Federal Reserve Act. Absent independent evidence of a contractual undertaking, a statutory entitlement "creates no vested right." *Dodge*, 302 U.S. at 79. Because "Congress at all times retains the ability to amend statutes, a power which inheres in its authority to legislate, Congress at all times retains the right to revoke legislatively created entitlements." *Members of Peanut Quota Holders Ass'n, Inc. v. United States*, 421 F.3d 1323, 1335 (Fed. Cir. 2005). Indeed, in this case, Congress "expressly reserved" its "right to amend, alter, or repeal" any provision of the Federal Reserve Act. *See* § 30, 38 Stat. 275 (1913), renumbered § 31, Pub. L. No. 95–630, title I, § 101, 92 Stat. 3641 (1978). Washington Federal emphasizes that, prior to the FAST Act, the six percent dividend rate had remained unchanged for over 100 years. But Washington Federal's "unilateral expectation" that Congress would not exercise its right to amend the dividend provision going forward does not give rise to a compensable property interest under the Fifth Amendment. *See Webb's*, 449 U.S. 161; *Peanut Quota Holders*, 421 F.3d at 1334 ("[Appellants] have no legally protected right against the government's making changes in the underlying [regulatory] program and no right to compensation for the loss in value resulting from the changes.").

Washington Federal's alternative takings theory contemplates a taking of its underlying capital investment in Reserve Bank stock without just compensation.[7] This

---

[7]    The trial court did not directly address this alternative takings theory. Washington Federal contends that

claim also fails. Washington Federal's initial subscription of stock was part of its voluntary participation in a regulatory scheme, and we have held that "enforceable rights sufficient to support a taking claim against the United States cannot arise in an area voluntarily entered into and one which, from the start, is subject to pervasive Government control." *Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 216 (Fed. Cir. 1993) (internal quotation marks omitted); *see also Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1339 (Fed. Cir. 2001) ("[R]egulatory actions requiring the payment of money are not takings."). Furthermore, under the Federal Reserve Act, Washington Federal can surrender its stock and obtain a refund of its paid-in capital. *See* 12 U.S.C. §§ 287, 321. Thus, the requirement that member banks subscribe to reserve bank stock under the Federal Reserve Act does not constitute a regulatory taking.

---

remand is necessary for the trial court to rule on this issue in the first instance. We conclude, however, that principles of judicial economy counsel against remand, and whether Washington Federal has adequately stated a claim under its alternative takings theory is an issue amenable to resolution for the first time on appeal. *See Glaxo Grp. Ltd. v. TorPharm, Inc.*, 153 F.3d 1366, 1371 (Fed. Cir. 1998) (noting that "an appellate court may choose to decide [an] issue even if not passed on by the trial court" where the issue "is one of law" and "has been fully vetted by the parties on appeal"); *Singleton v. Wulff*, 428 U.S. 106, 121 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases.").

Because the complaint fails to allege facts sufficient to support a taking under the Fifth Amendment, the trial court properly dismissed this claim under RCFC 12(b)(6).

## III

For the foregoing reasons, we conclude that the complaint fails to state a claim upon which relief may be granted. Thus, we affirm the trial court's grant of the government's motion to dismiss Washington Federal's claims under RCFC 12(b)(6).

**AFFIRMED**