# United States Court of Appeals for the Federal Circuit

---

**ROY LYNN MCCUTCHEN, PADUCAH SHOOTER'S SUPPLY, INC., INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2020-1188

---

Appeal from the United States Court of Federal Claims in No. 1:18-cv-01965-EDK, Judge Elaine Kaplan.

---

Decided: October 1, 2021

---

JENNIFER GELMAN, Flint Law Firm LLC, Edwardsville, IL, argued for plaintiffs-appellants. Also represented by ADAM MICHAEL RILEY.

KENNETH DINTZER, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by JEFFREY B. CLARK, ROBERT EDWARD KIRSCHMAN, JR., LOREN MISHA PREHEIM, NATHANAEL YALE.

---

Before TARANTO, WALLACH,* and CHEN, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* TARANTO.

Opinion concurring in the result filed by *Circuit Judge* WALLACH.

TARANTO, *Circuit Judge.*

On December 26, 2018, the U.S. Department of Justice, exercising congressionally granted authority to implement various federal firearms statutes, promulgated a rule that is the basis for the takings claim in this case. Bump-Stock-Type Devices, 83 Fed. Reg. 66,514 (Dec. 26, 2018) (Final Rule). The impetus for the proceeding was the massacre in Las Vegas on October 1, 2017, when a lone shooter, using "rifles with attached bump-stock-type devices," fired "several hundred rounds of ammunition in a short period of time, killing 58 people and wounding approximately 500." *Id.* at 66,516. Since 1986, 18 U.S.C. § 922(o) has declared it to be unlawful to possess or transfer a "machinegun" (with exceptions not applicable here, for governments and for lawful possession before the 1986 law took effect), with "machinegun" defined with specificity by statute, 26 U.S.C. § 5845(b) (incorporated by 18 U.S.C. § 921(a)(23)). In the Final Rule, the Department, which houses the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), adopted regulations that interpret the statutory definition and specifically provide that the definition includes "a bump-stock-type device, *i.e.*, a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter." 83 Fed. Reg. at 66,553–54. The Final Rule states that "[t]he bump-stock-type

---

*    Circuit Judge Evan J. Wallach assumed senior status on May 31, 2021.

devices covered by this final rule were not in existence prior to" 18 U.S.C. § 922(o).  *Id.* at 66,514.  As of March 26, 2019, the Rule's effective date, possessors of such devices had to destroy them or abandon them to ATF, or else face criminal penalties under 18 U.S.C. § 924(a)(2) for a "knowing" violation of 18 U.S.C. § 922(o).  *See id.* at 66,514, 66,520, 66,523.

Plaintiffs Roy McCutchen and Paducah Shooter's Supply, Inc. brought this action against the United States in the Court of Federal Claims (Claims Court) under the Tucker Act, 28 U.S.C. § 1491.  Asserting that the Final Rule effected a taking for public use of their bump-stock-type devices by requiring the devices' destruction or surrender to ATF, plaintiffs seek just compensation under the Fifth Amendment's Takings Clause.  Because it is the Final Rule that plaintiffs challenge and "[t]he bump-stock-type devices covered by this final rule were not in existence prior to the effective date of" 18 U.S.C. § 922(o), 83 Fed. Reg. at 66,514, plaintiffs' bump-stock-type devices necessarily were not in existence before § 922(o) took effect.  Although the Rule's validity has been disputed in other cases, plaintiffs accept, in their pursuit of their compensation claim, that the Final Rule is an authorized and lawful (*i.e.*, valid) implementation of the statutory bar on possession or transfer of a "machinegun."

The government moved to dismiss the claim under Court of Federal Claims Rule 12(b)(6).  By the time the motion was fully briefed, the Rule's effective date had arrived, and plaintiffs had complied with the Rule and destroyed their bump-stock-type devices.  The Claims Court granted the motion and dismissed the takings claim.  It principally relied on the "police power" doctrine, concluding that, because the Final Rule sought to protect health and safety, it did not effect a taking for public use.  *See McCutchen v. United States*, 145 Fed. Cl. 42, 51–53 (2019).

We affirm, but we do so on a threshold ground different from, though related to, the Claims Court's grounds. The interest that plaintiffs allege was taken was the interest in continued possession or transferability of their devices. The takings claim depends on plaintiffs having an established property right in continued possession or transferability even against a valid agency implementation of the preexisting statutory bar on possession or transfer. But plaintiffs' title, which we assume is otherwise valid under state law, was always inherently limited by 18 U.S.C. § 922(o), a very specific statutory prohibition on possession and transfer of certain devices defined in terms of physical operation, together with a congressional authorization of a (here undisputedly) valid agency interpretation of that prohibition. That title-inhering limit means that plaintiffs lacked an established property right in continued possession or transferability. The takings claim therefore fails.

I

A

In 1934, Congress enacted the National Firearms Act, Pub. L. No. 73–474, 48 Stat. 1236 (NFA or 1934 Act). The Act regulated the importation, manufacture, transfer, sale, and possession of certain firearms, including "machineguns."[1] *See* 26 U.S.C. § 5801 *et seq.* Congress specifically defined "machinegun." *Id.* § 5845(b) (current version, quoted *infra*). Congress included penalty and forfeiture provisions and also subjected violators to the general enforcement measures available under the internal-revenue laws. *Id.* §§ 5871–72.

About thirty years later, Congress enacted the Gun Control Act of 1968, Pub. L. No. 90–618, 82 Stat. 1213

---

[1]    Statutory and regulatory provisions sometimes use "machinegun," sometimes "machine gun." Except when quoting, we use the latter.

(GCA or 1968 Act).  *See* 18 U.S.C. § 921 *et seq.*  In that Act, Congress established a regulatory licensing scheme and imposed criminal prohibitions on certain firearm transactions.  18 U.S.C. § 923.  The GCA incorporates the National Firearm Act's "machinegun" definition.  *Id.* § 921(a)(23) ("The term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b)).").

In 1986, Congress adopted the Firearm Owners' Protection Act, Pub. L. No. 99–308, 100 Stat. 449 (FOPA or 1986 Act), which amended the Gun Control Act and National Firearm Act.  The 1986 Act added 18 U.S.C. § 922(o), which provided when enacted and still provides:

(o)(1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

(2) This subsection does not apply with respect to—

(A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

(B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect [May 19, 1986].

§ 102, 100 Stat. at 453; 18 U.S.C. § 922(o).  That language makes it unlawful to possess or transfer a "machinegun," with exceptions for governments and pre-FOPA lawful possession.  *See* Final Rule, 83 Fed. Reg. at 66,515 (noting that the amendment "effectively froze the number of legally transferrable machineguns to those that were registered before the effective date of the statute").  A "knowing" violation subjects the violator to criminal penalties, 18 U.S.C.

§ 924(a)(2); a "willful" violation subjects the violator to "seizure and forfeiture" remedies, *id.* § 924(d)(1).

The crucial term, "machinegun," is declared, in 18 U.S.C. § 921(a)(23), to have the meaning specified in 26 U.S.C. § 5845(b). Since 1986, that definition has provided:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, *automatically* more than one shot, without manual reloading, by a *single function of the trigger*. The term shall also include the frame or receiver of any such weapon, *any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun*, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b) (emphases added).[2]

---

[2]   The italicized phrase, "any part designed . . . ," was substituted in 1986 for the phrase, "any combination of parts designed and intended for use in converting a weapon into a machinegun." 1986 Act, § 109(a), 100 Stat. at 460. The 1968 Act enacted the following version of 26 U.S.C. § 5845(b): "(b) MACHINEGUN.—The term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any combination of parts designed and intended for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." § 201, 82 Stat. at 1231.

In 18 U.S.C. § 926(a), Congress has granted the Attorney General the authority to promulgate rules and regulations "necessary to carry out" chapter 44 of Title 18, U.S. Code, which includes 18 U.S.C. § 922. In 26 U.S.C. § 7801(a), Congress has made the Attorney General responsible for the "administration and enforcement" of chapter 53 of Title 26, U.S. Code, which includes 26 U.S.C. § 5845. The grants of implementation authority have been in place since 1986: The current "necessary to carry out" language of 18 U.S.C. § 926(a) was adopted in the 1986 Act, replacing the preexisting "reasonably necessary" authority, § 106, 100 Stat. at 459; and even before the 1986 Act, 26 U.S.C. § 7801(a) granted the Executive the "administration and enforcement" authority relevant here, 26 U.S.C. § 7801(a) (1982). Before 2002, both authorities resided with the Secretary of the Treasury, *see* 18 U.S.C. §§ 921(a)(18), 926(a) (2000); 26 U.S.C. § 7801(a) (2000), but in 2002, they were transferred to the Attorney General as part of the relocation of ATF to the Department of Justice, *see* Homeland Security Act of 2002, Pub. L. No. 107–296, § 1111, 116 Stat. 2135, 2274–75; 28 U.S.C. § 599A(c)(1). The Attorney General has delegated relevant authority to ATF. 28 C.F.R. § 0.130(a)(1)–(2).

B

A rifle is semiautomatic if, after it has been fired, rechambering of ammunition is automatic but refiring is not. Specifically, "[t]he term 'semiautomatic rifle' means any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate

The 1934 Act's original definition reads: "The term 'machine gun' means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger." § 1(b), 48 Stat. at 1236.

pull of the trigger to fire each cartridge." 18 U.S.C. § 921(a)(28). A "bump-stock-type device" transforms a semiautomatic rifle so that "a separate pull of the trigger to fire each cartridge" is not needed. Such a device replaces the generally stationary stock resting against the shooter's shoulder with a sliding stock that lets the shooter substantially increase the rate of fire without a commensurate increase in the number of finger motions pulling the trigger. Final Rule, 83 Fed. Reg. at 66,516. The device channels and directs the recoil energy from each shot "into the space created by the sliding stock (approximately 1.5 inches) in constrained linear rearward and forward paths." *Id.* at 66,518. By maintaining constant backward pressure on the trigger (without repeated finger motions to pull the trigger) and constant forward pressure on the front of the gun, a shooter can fire bullets continuously and at a high rate to "mimic" the performance of a fully automatic weapon. *Id.* at 66,516.

A variety of devices with different mechanisms for using the firearm's recoil energy to refire without a new movement of the finger (a separate new pull motion of the finger) came to ATF's attention long before the proceeding that ended with the Final Rule. In 2002, ATF "initially reviewed the Akins Accelerator." *Id.* at 66,517. Unlike the devices at issue here, the Akins Accelerator used springs to cause the trigger to continue to make contact with the shooter's finger rather than relying on the shooter to maintain pressure on the trigger and the firearm. *See id.* at 66,514, 66,516–17; *see also Akins v. United States*, 312 F. App'x 197, 200 (11th Cir. 2009) ("After a single application of the trigger by a gunman, the Accelerator uses its internal spring and the force of recoil to fire continuously the rifle cradled inside until the gunman releases the trigger or the ammunition is exhausted.").

Initially, in 2002, ATF determined that the device was *not* a machine gun "because ATF interpreted the statutory term 'single *function* of the trigger' to refer to a single

*movement* of the trigger." Final Rule, 83 Fed. Reg. at 66,517 (emphases added). But in 2006, ATF reversed course in a published ruling. *See* ATF Ruling 2006-2. After retesting the Akins Accelerator, ATF determined that with the device, "a single pull of the trigger initiates an automatic firing cycle [that] continues until the finger is released or the ammunition supply is exhausted." *Id.* at 2. This time ATF interpreted the statutory phrase "single *function* of the trigger" as "single *pull* of the trigger." *Id.* (emphases added). Given that interpretation, ATF readily determined that the Akins Accelerator was a machine gun under the NFA and GCA. *Id.* at 2–3. When Akins challenged ATF's determination in federal court, the Eleventh Circuit, agreeing with the district court, affirmed ATF's statutory interpretation and consequent determination that the Akins Accelerator was a machine gun. *Akins*, 312 F. App'x at 199–201; *Akins v. United States*, No. 8:08-cv-988-T-26TGW, 2008 WL 11455059, at *3–8 (M.D. Fla. Sept. 23, 2008).

Thereafter, ATF considered other bump-stock-type devices. As ATF later described its actions, ATF advised that a number of such devices were not machine guns—including the ones at issue here. *See* Final Rule, 83 Fed. Reg. at 66,517. Specifically, in ten unpublished classification rulings between 2008 and 2017, ATF "provided different explanations for why certain bump-stock-type devices were not machineguns, but none of them extensively examined the meaning of 'automatically.'" *Id.* at 66,518. All those decisions were subject to ATF's publicly available handbook warning that such rulings could not be relied upon as guaranteeing inapplicability of the existing statutory prohibitions if reconsidered and modified. *See* National Firearms Act Handbook § 7.2.4.1 (Handbook) (relevant portions have stayed the same from at least 2007 to now). Indeed, the Eleventh Circuit relied on ATF's power to "reconsider and rectify" a classification decision when upholding ATF's 2006 ruling on the Akins Accelerator after ATF's

contrary 2002 ruling. *See Akins*, 312 F. App'x at 200 ("Based on the operation of the Accelerator, the Bureau had authority to 'reconsider and rectify' what it considered to be a classification error.").

## C

Within a few months of the October 1, 2017 massacre in Las Vegas, reconsideration of bump-stock-type devices began. The Department of Justice issued an Advanced Notice of Proposed Rulemaking on December 26, 2017, to get "information and comments from the public and industry regarding the nature and scope of the market for" "certain devices, commonly known as 'bump fire' stocks." Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices, 82 Fed. Reg. 60,929, 60,929 (Dec. 26, 2017). About two months later, the President "direct[ed] the Department of Justice to dedicate all available resources . . . as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns." Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices, 83 Fed. Reg. 7,949, 7,949 (Feb. 20, 2018).

Nearly a month after that, the Department issued a Notice of Proposed Rulemaking that sought "to clarify that [bump-stock-type devices] are 'machineguns.'" *See* Bump-Stock-Type Devices, 83 Fed. Reg. 13,442, 13,442 (Mar. 29, 2018). On December 26, 2018, the Department completed its process of "reexamining" its 2008–17 decisions and issued the Final Rule, which adopted new regulations, with an effective date of March 26, 2019. 83 Fed. Reg. at 66,514, 66,520–21, 66,553–54.

The regulations specifically interpret one phrase and one term in the detailed statutory definition of "machinegun." *Id.* at 66,553–54; *see also* 27 C.F.R. §§ 447.11, 478.11, 479.11. Thus, codifying the 2006 definition from the Akins Accelerator proceeding, the regulations define the phrase "single function of the trigger" as "a single pull

of the trigger and analogous motions."  83 Fed. Reg. at
66,553–54.  The regulations also newly define the term "au-
tomatically"—to mean "functioning as the result of a self-
acting or self-regulating mechanism that allows the firing
of multiple rounds through a single function of the trigger."
*Id.* at 66,553.  The regulations also make clear that, under
those definitions, bump-stock-type devices, as specifically
defined in the regulations (quoted *supra*), are "ma-
chineguns." *Id.* at 66,553–54.  The Department explained
that the two adopted definitions were the "best interpreta-
tion" of the statutory definition of "machinegun." *Id.* at
66,514, 66,517–18, 66,521.  It added that, although the "fi-
nal rule reflects the public safety goals of the NFA and
GCA," *id.* at 66,522, "[t]he bump-stock-type device rule is
not a discretionary policy decision based upon a myriad of
factors that the agency must weigh, but is instead based
only upon the functioning of the device and the application
of the relevant statutory definition," *id.* at 66,529.

The Final Rule's consequence was that individuals
would be subject to "criminal liability only for possessing
bump-stock-type devices *after* the effective date of [this]
regulation"—March 26, 2019.  *Id.* at 66,514, 66,525; *see
also, e.g., id.* at 66,525 ("The rule would criminalize only
future conduct, not past possession of bump-stock-type de-
vices that ceases by the effective date of this rule.").  To
avoid liability, possessors of bump-stock-type devices had
to destroy their devices or abandon them at an ATF office
by March 26, 2019.  *Id.* at 66,549 (describing "[d]isposal"
options); *see also, e.g., id.* at 66,514–15, 66,530, 66,539,
66,543.

## II

On December 26, 2018, plaintiffs sued the United States in the Claims Court. *See* J.A. 22–30 (Complaint).[3] McCutchen and Paducah possessed bump-stock-type devices before the publication of the Rule and destroyed those devices before the Rule's effective date. J.A. 23–24, ¶¶ 10–11; *McCutchen*, 145 Fed. Cl. at 45 (citing ECF No. 12).

The government moved to dismiss the complaint for failure to state a claim under Rule 12(b)(6), and the Claims Court granted the motion. *See McCutchen*, 145 Fed. Cl. at 45. In reaching that result, the court determined that the Final Rule did not effect a taking for public use because ATF acted "pursuant to its police power." *Id.* at 51. The Claims Court also concluded that plaintiffs' claim of a physical taking failed because the term "take[]" does not cover a regulation compelling dispossession of property by requiring the owner to destroy the property (or else surrender it to the government) and that plaintiffs' alternative claim of total elimination of value failed because personal (not real) property is "subject to pervasive government regulation." *Id.* at 53–55. Finally, the court determined that plaintiffs "waived" any argument for a taking under the flexible takings standard governing use restrictions and, in any event, could not show such a taking. *Id.* at 55–57.

Plaintiffs timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## III

We review the grant of a motion to dismiss de novo. *Prairie County v. United States*, 782 F.3d 685, 688 (Fed. Cir. 2015). "To survive a motion to dismiss, a complaint

---

[3]    Plaintiffs sought certification of a class. J.A. 26, ¶ 26. The Claims Court dismissed the complaint under Rule 12(b)(6) without ruling on class certification.

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). We may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). "Whether a taking has occurred is a question of law based on factual underpinnings." *Caquelin v. United States*, 959 F.3d 1360, 1366 (Fed. Cir. 2020).

A

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. Takings have been classified in various ways. For example, some involve "physical appropriations" and some "use restrictions." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071–72 (2021). Categorical rules have generally applied to the former category. *Id.* at 2071. Use restrictions generally are subject to the "flexible test developed in [*Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978)]," *see Cedar Point*, 141 S. Ct. at 2072, although use restrictions that deprive a landowner of "all economically beneficial or productive use of land" have been deemed a categorical taking, *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015, 1019 (1992). On appeal, plaintiffs pursue only physical-appropriation and *Lucas* categorical-taking contentions. *See* McCutchen Opening Br. at 34–39, 39 n.9 (not making *Penn Central* contention).

We do not reach the grounds on which the Claims Court relied. In particular, we do not decide under what circumstances a measure that *newly* bars possession of personal property (as opposed to restricting a use of property) and that serves a "police power" purpose (and is constitutionally authorized for the federal government) is not a

"taking," and thus requires no compensation.[4] Nor do we decide whether mandating permanent dispossession by ordering destruction of personal property cannot be a "physical taking," even if the government-specified alternative to destruction is surrender to the government and the mandate is backed by government remedies of seizure and forfeiture for a willful violation as well as criminal remedies for a knowing violation.

We do not resolve substantial questions raised by those issues. For example, the Supreme Court has said that the Takings Clause both bars takings that are not for a "public use" and requires payment for takings that are for such a use, *see Kelo v. City of New London*, 545 U.S. 469, 480 (2005); *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 240 (1984), and it has also said that "[t]he 'public use' requirement is . . . coterminous with the scope of a sovereign's police powers," *Midkiff*, 467 U.S. at 240; *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1014 (1984). Under those premises, the question arises: If a "police power" justification for a measure means that there is no taking, what government acts would fall into the category of takings that the Clause permits (because the act is for a "public use," *i.e.*, within the "sovereign's police powers") but only upon payment of just compensation? And if the "police power" doctrine is to be cabined to some subset of police powers, as the Claims Court suggested might be necessary,

---

    [4]    We have recognized that a "police power" rationale, where the federal government is concerned, must be considered within the context of constitutional authorization of particular powers. *See, e.g.*, *Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177, 1191–92 & n.10 (Fed. Cir. 2004); *Florida Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1568 n.17 (Fed. Cir. 1994); *Allied-Gen. Nuclear Servs. v. United States*, 839 F.2d 1572, 1576 (Fed. Cir. 1988).

145 Fed. Cl. at 51, and the government suggested at oral argument, Oral Arg. at 48:42–52:53 (referring without definition to "core police powers"), the questions arise: What would that cabining be, what ground would it rest on, and how would it address recognized challenges, among them challenges of workable line-drawing? *See Lucas*, 505 U.S. at 1024, 1026; *Midkiff*, 467 U.S. at 239–40.

These and other questions would be unavoidable were we to address the Claims Court's rationales. We have no precedent that is so on point—involving facts and holdings so close to those presented here—that we could justifiably apply the rationales without extensive exploration of the doctrinal issues. Notably, the main authorities from this court relied on by the Claims Court for its police-power analysis involved government dispossessions of personal property that rested on specific government authority that long predated the possession of the personal property at issue. *See, e.g.*, *Kam-Almaz v. United States*, 682 F.3d 1364, 1372 (Fed. Cir. 2012) (evidentiary seizure at airport upon entry from overseas, exercising the "government's power to police the border"); *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1150, 1153 (Fed. Cir. 2008) (seizure of drugs for use in criminal prosecutions); *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1328–29 (Fed. Cir. 2006) (seizure and forfeiture of goods entering country with counterfeit trademarks). Reviewing the Claims Court's rationales would call for extensive analysis to decide how far beyond such circumstances a "police power" rationale properly applies and whether it properly reaches this case. *Cf. Cedar Point*, 141 S. Ct. at 2079 (discussing "longstanding background restrictions on property rights" including "background limitations" of "traditional common law privileges").

We resolve the case on a threshold ground that differs from, though is related to, the Claims Court's grounds—one that involves the preexisting-law circumstance that was present in the just-cited cases. Plaintiffs' takings

claim depends on the "threshold matter" of whether they have "established a property interest for purposes of the Fifth Amendment" against the government action. *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1377 (Fed. Cir. 2008); *see also Stop the Beach Renourishment, Inc. v. Florida Dep't of Envt'l Prot.*, 560 U.S. 702, 715 (2010) (plurality) ("If a legislature *or a court* declares that what was once an *established* right of private property no longer exists, it has taken that property, no less than if the State had physically appropriated it or destroyed its value by regulation." (second emphasis added)). "[T]o have a cause of action for a Fifth Amendment taking, the plaintiff must point to a protectable property interest that is asserted to be the subject of the taking." *Palmyra Pacific Seafoods, LLC v. United States*, 561 F.3d 1361, 1364 (Fed. Cir. 2009); *see also, e.g., Gadsden Indus. Park, LLC v. United States*, 956 F.3d 1362, 1368 (Fed. Cir. 2020) ("The plaintiff in a takings case bears the burden to demonstrate a protectable property interest."); *American Bankers Ass'n v. United States*, 932 F.3d 1375, 1384–85 (Fed. Cir. 2019) ("To state a claim for a taking under the Fifth Amendment, a plaintiff must identify a legally cognizable property interest."); *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001) ("It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation."); *Alimanestianu v. United States*, 888 F.3d 1374, 1380 (Fed. Cir. 2018); *Sharifi v. United States*, 987 F.3d 1063, 1068 (Fed. Cir. 2021).[5]

---

[5]    Unlike Judge Wallach, we see no basis for limiting this general threshold aspect of takings analysis, concerning the property right alleged to have been taken, to the particular type of government activity—a land-use restriction that deprives a landowner of all economically beneficial or productive use of the land—that was at issue in *Lucas*.

As explained next, we conclude that, given the preexisting federal statutory prohibition on possession or transfer of "machineguns," 18 U.S.C. § 922(o), subject to a valid implementation by the Attorney General, plaintiffs lacked a property right in what they allege was taken—continued possession or transferability of their bump-stock-type devices.

B

"[P]roperty interests . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source." *Ruckelshaus*, 467 U.S. at 1001 (cleaned up); *see also Phillips v. Washington Legal Found.*, 524 U.S. 156, 164 (1998) (similar). Here, we assume that, as a matter of state law standing alone, plaintiffs had property rights in the personal property at issue. But "the government does not take a property interest when it merely asserts a 'pre-existing limitation upon the [property] owner's title.'" *Cedar Point*, 141 S. Ct. at 2079 (quoting *Lucas*, 505 U.S. at 1028–29). As we have explained, "[t]he Supreme Court in *Lucas* made clear that property interests are acquired subject to 'background principles' of law, and that limitations on property rights that otherwise would effect a categorical taking are permissible if they 'inhere in the title itself.'" *Bair v. United States*, 515 F.3d 1323, 1327 (Fed. Cir. 2008) (quoting *Lucas*, 505 U.S. at 1029); *see also A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1152–53 (Fed. Cir. 2014) (explaining the principle). And valid preexisting federal-law limitations on what otherwise would be state-law property rights are among the limitations that may inhere in title so as to limit compensable property rights. *See Bair*, 515 F.3d at 1329 (explaining that "a federal statute or authority can constitute a 'background principle' that inheres in the title to property interests arising after its enactment, therefore precluding a takings claim based on the application of the statute to those property interests"); *see also Dames & Moore v. Regan*, 453 U.S. 654, 674 n.6 (1981) (rejecting

takings claim on this basis); *cf. Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1349 (Fed. Cir. 2021) (rejecting exaction claim for lack of protected property interest based on *Dames & Moore* and *American Bankers Ass'n*).

In this case, the federal-law prohibition on possession and transfer, together with a congressional grant of implementation authority, predated the existence, let alone plaintiffs' possession, of the bump-stock-type devices that plaintiffs were compelled to destroy or surrender.[6] That prohibition is a very specific one, defined in terms of the physical operation of particular devices, not in terms simply of a broadly stated goal. The latter situation raises issues not presented here. *See Preseault v. United States*, 100 F.3d 1525, 1537–38 (Fed. Cir. 1996) (en banc); *see also Bair*, 515 F.3d at 1330 (explaining this court's *Preseault* conclusion that "broad general legislation authorizing a federal agency to engage in future regulatory activity, did not effectively limit the property right" (cleaned up)). And the Final Rule is an interpretation of the text of that specific statutory prohibition (in context, of course), not an exercise of discretion to act in pursuit of a broadly stated statutory goal.

Moreover, plaintiffs accept that the Final Rule's implementation of the preexisting prohibition is an authorized and legally valid interpretation of the statutory prohibition, making no argument to the contrary. For that reason, and in light of our precedents, we accept that premise. *See Rith Energy, Inc. v. United States*, 270 F.3d 1347, 1352 (Fed. Cir. 2001) ("[I]n a takings case we assume that the underlying governmental action was lawful . . . ."); *Rith*

---

[6]    In at least this respect, the present case differs critically from *Maryland Shall Issue, Inc. v. Hogan*, 963 F.3d 356 (4th Cir. 2020), which involved a state law enacted after the creation and acquisition of the property at issue (there, bump-stock-type devices as well). *Id.* at 359–60.

*Energy, Inc. v. United States*, 247 F.3d 1355, 1366 (Fed. Cir. 2001) (stating that a plaintiff must "litigate its takings claim on the assumption that the administrative action was both authorized and lawful"); *see also St. Bernard Par. Gov't v. United States*, 887 F.3d 1354, 1360 (Fed. Cir. 2018); *Acadia*, 458 F.3d at 1330–31; *Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1369–70 (Fed. Cir. 2005); *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1362 (Fed. Cir. 1998); *Crocker v. United States*, 125 F.3d 1475, 1476 (Fed. Cir. 1997).

The accepted validity of the Final Rule as an interpretation of the preexisting statutory prohibition on possession and transfer must, at least in this case, rest on one of three premises: (1) the interpretive-deference doctrine of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), is inapplicable, and the Final Rule is valid as the best interpretation of the statutory prohibition; (2) *Chevron* applies and the Final Rule is valid at Step 1, so that the statutory prohibition unambiguously requires the interpretation articulated in the Final Rule; or (3) *Chevron* applies and the Final Rule is valid at Step 2, so that it is (merely) one reasonable interpretation of the statutory prohibition. We do not decide which possibility would govern in a determination of the validity of the Final Rule (which we assume); in particular, we do not decide whether 18 U.S.C. § 922(o), to which criminal penalties apply if the violation is knowing, is subject to *Chevron*. Under any of these three possibilities, we hold, based on the preexisting federal law, that plaintiffs lack a property right in continued possession or transferability of the devices at issue. We first address the legal bases for so concluding and then explain why, in this case, the ATF classification rulings between 2008 and 2017 do not support a different conclusion.

1

The analysis of the first two possibilities is particularly simple. If *Chevron* is inapplicable, validity entails that the Final Rule's interpretation is the "best interpretation" of 18 U.S.C. § 922(o), with its incorporated "machinegun" term, as defined in 26 U.S.C. § 5845(b). *See Chudik v. Hirshfeld*, 987 F.3d 1033, 1039 (Fed. Cir. 2021) ("Where the *Chevron* framework is inapplicable, we determine the best interpretation of the statute for ourselves, while giving the agency's position such weight as warranted under [*Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944)]." (citations and internal quotation marks omitted)). Similarly, if *Chevron* applies but validity is resolved at *Chevron* Step 1, then validity entails that the Final Rule's interpretation is the unambiguous meaning of 18 U.S.C. § 922(o). In either event, the preexisting statute itself, properly understood, barred the possession or transfer at issue. In these circumstances, the bar always limited plaintiffs' title, and plaintiffs never had a property right against government assertion of the duty to destroy the devices at issue or surrender them. *See Hurtado v. United States*, 410 U.S. 578, 588 (1973) ("[T]he Fifth Amendment does not require that the Government pay for the performance of a public duty it is already owed.").[7]

---

[7]    We do not consider whether, and if so when, it could make a difference if, before a plaintiff's possession, some courts had actually, though incorrectly, adjudicated the relevant property to be outside a statutory prohibition on possession. No such adjudication took place with respect to plaintiffs' bump-stock-type devices. Relatedly, and relevant to the third possibility (*Chevron* Step 2) discussed next, there was no authoritative judicial adoption of a contrary meaning from which the agency departed in the Final Rule. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005) (holding that an

The remaining possibility for the validity of the Final Rule's interpretation—that *Chevron* applies and the interpretation is valid only at *Chevron* Step 2—requires somewhat more analysis, but the conclusion is the same. The additional element is the pair of preexisting statutory grants of implementation authority to the Executive. 18 U.S.C. § 926(a) (authority to adopt rules "necessary to carry out" the provisions of chapter 44 of Title 18, U.S. Code, including 18 U.S.C. § 922(o)); 26 U.S.C. § 7801(a) (authority over "administration and enforcement" of chapter 53 of Title 26, U.S. Code, including 26 U.S.C. § 5845(b)). For plaintiffs here, the preexisting limitation on their title included subjection to future valid agency interpretations of the possession-and-transfer prohibition (as assumed here) adopted in the exercise of that authority. In these circumstances, plaintiffs had no property interest protected by the compensation requirement of the Takings Clause against such a valid interpretation when adopted.

By 1986, the Supreme Court's 1984 decision in *Chevron* already made clear that the law, for a statute like 18 U.S.C. § 922(o), included the possibility of reasonable resolutions of ambiguities. For the title-limiting § 922(o) in particular, the choices were limited as relevant here—focused overwhelmingly, though not exclusively, on whether 26 U.S.C. § 5845(b)'s "single function of the trigger" language, in context, could be understood to mean a single volitional finger movement of the shooter (which could produce multiple firings if recoil energy were captured). We cannot say that plaintiffs had "an established right of private property," *Stop the Beach*, 560 U.S. at 715 (plurality), in the possibility that the agency would adopt one rather than another of the limited range of interpretations (both reasonable, by

agency may depart from a prior judicial interpretation that adopted the best reading of a statute but did not find that reading to be the unambiguous meaning of the statute).

assumption) relevant here. *Cf. Murr v. Wisconsin*, 137 S. Ct. 1933, 1950 (2017) (Roberts, C.J., dissenting) (reasoning that the Takings Clause protects owners of "*established* property rights"). We have no basis for deeming any interest in either possibility a "*recognized* property interest" required for a takings claim. *Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1582 (Fed. Cir. 1993) (emphasis added). Rather, such possibilities are "contingent and uncertain," "speculative or discretionary," which is not enough. *Bowers v. Whitman*, 671 F.3d 905, 913 (9th Cir. 2012) (citation and internal quotation marks omitted); *see also id.* ("To determine whether a property interest has vested for Takings Clause purposes, 'the relevant inquiry is the certainty of one's expectation in the property interest at issue.' . . . [I]f the property interest is 'contingent and uncertain' or the receipt of the interest is 'speculative' or 'discretionary,' then the government's modification or removal of the interest will not constitute a constitutional taking." (citations omitted)); *Angelotti Chiropractic, Inc. v. Baker*, 791 F.3d 1075, 1081 (9th Cir. 2015) (same).

At least in the absence of other circumstances not present here, we conclude, the preexisting law limiting title means that plaintiffs had no property interest in continued possession or transferability that was taken when the Final Rule—validly, by assumption here—required destruction or surrender of their bump-stock-type devices.

2

Only one more circumstance requires discussion, but it does not support a different conclusion. As the Final Rule describes, between 2008 and 2017, ATF issued "ten letter rulings" stating that certain bump-stock-type devices, including the ones at issue here, did not meet the statutory definition of "machinegun" and so were not within the prohibition of 18 U.S.C. § 922(o). 83 Fed. Reg. at 66,517–18. But those rulings at best gave plaintiffs a property interest subject to the express reservation to change the devices'

classification if the agency later determined, as it did, that the earlier classification was erroneous. Accordingly, those letter rulings gave plaintiffs no property right in continued possession or transferability.

ATF's handbook, which is public, states that a classification provided by letter is "subject to change if later determined to be erroneous" by ATF:

> **7.2.4 Do you know how ATF would classify your product?** There is no requirement in the law or regulations for a manufacturer to seek an ATF classification of its product prior to manufacture. Nevertheless, a firearms manufacturer is well advised to seek an ATF classification before going to the trouble and expense of producing it. Perhaps the manufacturer intends to produce a GCA firearm but not an NFA firearm. Submitting a prototype of the item to ATF's Firearms Technology Branch (FTB) for classification in advance of manufacture is a good business practice to avoid an unintended classification and violations of the law.
>
>> **7.2.4.1 ATF classification letters.** ATF letter rulings classifying firearms may generally be relied upon by their recipients as the agency's official position concerning the status of the firearms under Federal firearms laws. Nevertheless, *classifications are subject to change if later determined to be erroneous or impacted by subsequent changes in the law or regulations*. To make sure their classifications are current, FFLs/SOTs [federal firearms licensees/special occupational taxpayers] should stay informed by periodically checking the information published on ATF's website, particularly amendments to the law or

> regulations, published ATF rulings, and
> "open letters" to industry members.

Handbook § 7.2.4 (italics emphasis added); *see also id.*
§§ 1.2.6, 1.2.11 (definitions for "FFL" and "SOT"). The
quoted express reservation is present in the 2007 Hand-
book, predating the 2008–17 classification letters at issue,
and remains there today. *Id.* § 7.2.4.1. Moreover, it was
long ago established that, even for formal approvals of im-
port applications, ATF "must necessarily retain the power
to correct [an] erroneous approval," consistent with the
widespread recognition of "an implied authority in other
agencies to reconsider and rectify errors even though the
applicable statute and regulations do not expressly provide
for such reconsideration." *Gun S., Inc. v. Brady*, 877 F.2d
858, 862–63 (11th Cir. 1989). And the Eleventh Circuit, in
early February 2009, confirmed specifically with respect to
a classification ruling involving an early bump-stock-type
device (the Akins Accelerator) that ATF "had authority to
'reconsider and rectify' what it considered to be a classifi-
cation error." *Akins*, 312 F. App'x at 200 (quoting *Gun S.*,
877 F.2d at 862–63).

Given the clear provisional character of a classification
letter, plaintiffs cannot be said to have a compensable prop-
erty right in the classification letters sent between 2008
and 2017, which have been properly corrected (as the as-
sumption of the Final Rule's validity entails). The Su-
preme Court in *Dames & Moore* concluded that the
President's nullification of an attachment against certain
bank assets was not a taking because the pre-attachment
regulations made clear that, in the Court's words, "any at-
tachment is null and void 'unless licensed,' and all licenses
may be revoked at any time." 453 U.S. at 674 n.6; *see also
id.* at 663 (quoting regulations). On that basis, the Court
held, the "petitioner did not acquire any 'property' interest
in its attachments of the sort that would support a consti-
tutional claim for compensation." *Id.* at 674 n.6. We drew
a similar conclusion in *American Bankers Ass'n*. We held

that the plaintiffs lacked a property right, for takings purposes, in continuation of a particular statutory dividend rate on Federal Reserve stock, where Congress had "expressly reserved" its right to change the dividend rate. 932 F.3d at 1385; *cf. Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 55 (1986) ("The provision simply cannot be viewed as conferring any sort of 'vested right' in the face of precedent concerning the effect of Congress' reserved power on agreements entered into under a statute containing the language of reservation."); *Columbus Reg'l Hosp.*, 990 F.3d at 1349 (concluding that the plaintiff "never had an unconditional interest" in certain funds because the government "expressly reserved the right to recover those funds for certain reasons within a specific period of time"). For the same reason, plaintiffs here had no property right in the 2008–17 classification letters, which the agency could correct for error without effecting a taking.

Although we think that no more is needed to reject plaintiffs' reliance on the 2008–17 letters, we note in addition several aspects of those letters, identified by the Final Rule itself, that undermine reliance on them as having legal force and effect. They were informal rulings, not published on ATF's website or otherwise and not issued through the authorized rulemaking process that is presumed to be the means of securing *Chevron* deference. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) ("A premise of *Chevron* is that when Congress grants an agency the authority to administer a statute by issuing regulations with the force of law, it presumes the agency will use that authority to resolve ambiguities in the statutory scheme."); *United States v. Mead Corp.*, 533 U.S. 218, 230 (2001) ("[T]he overwhelming number of our cases applying *Chevron* deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication."). ATF's Handbook, besides expressly declaring the revisability of a classification letter, defines "ATF Ruling" to

"mean[] a *formal ruling published by ATF* stating its interpretation of the law and regulations as applied to a specific set of facts," Handbook § 1.2.3 (emphasis added), and says, even as to those Rulings, that they "do not have the force and effect of law but may be cited as precedent with respect to substantially similar fact situations," *id.* § 1.4.2. All the more so for the informal classification letters. Further, the Final Rule suggests that those classification letters were "procedurally defective" in a sense recognized in *Encino* as eliminating *Chevron* deference—namely, they omitted discussion that would be needed to meet the requirement of "adequate reasons." 136 S. Ct. at 2125; *see* Final Rule, 83 Fed. Reg. at 66,518 ("Of the rulings issued between 2008 and 2017, ATF provided different explanations for why certain bump-stock-type devices were not machineguns, but none of them extensively examined the meaning of 'automatically.'").

Plaintiffs point to the D.C. Circuit's conclusion that the Final Rule is a "legislative rule." *See Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 17–20 (D.C. Cir. 2019). But that ruling does not aid plaintiffs in their takings claim. It does not adjudicate the essential question here—whether plaintiffs had a compensable property right in continued possession and transferability when, as assumed here, the Final Rule adopted a valid interpretation of the preexisting ban on possession and transfer of "machineguns," as defined.

## IV

For the foregoing reasons, we affirm the Claims Court's judgment.

The parties shall bear their own costs.

**AFFIRMED**

# United States Court of Appeals
## for the Federal Circuit

---

**ROY LYNN MCCUTCHEN, PADUCAH SHOOTER'S SUPPLY, INC., INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2020-1188

---

Appeal from the United States Court of Federal Claims in No. 1:18-cv-01965-EDK, Judge Elaine Kaplan.

---

WALLACH, *Circuit Judge*, concurring in the result.

I agree we should affirm the Court of Federal Claims' decision. I do not, however, agree with the majority's reasoning and concur as to the result only. I believe the "inhere in title" exception, set forth in *Lucas*, is not the proper vehicle to ascertain whether Mr. McCutchen and Paducah failed to state a compensable takings claim. That exception may inadvertently grant protections reserved to real property, and limited instances of personal property under extraordinary circumstances, to dangerous and unusual weapons. I write separately to explain why the Court of Federal Claims correctly concluded that the Bump Stock

Rule was not a compensable taking under the police powers doctrine.

## I. PROCEDURAL HISTORY

In December 2018, Mr. McCutchen and Paducah filed their Complaint in the Court of Federal Claims. J.A. 22; *see* J.A. 22–30 (Complaint). Paducah is a registered firearms dealer and retailer of "firearm parts and accessories." J.A. 24. Prior to the Bump Stock Rule, it "had a property interest in multiple bump-stock devices." J.A. 24. Mr. McCutchen previously purchased multiple bump stocks "for both his personal use and for economic gain." J.A. 23. The Complaint alleged that the Bump Stock Rule constitutes a compensable Fifth Amendment taking of bump stocks as it "destroyed all economic value and all investment-backed expectations in [parties'] bump-stocks." J.A. 29. The Government moved to dismiss Paducah's Amended Complaint for failure to state a claim on which relief can be granted. J.A. 31, 37 (Motion to Dismiss).

The Court of Federal Claims dismissed Appellants' Amended Complaint. *See McCutchen v. United States*, 145 Fed. Cl. 42, 45 (2019). The Court of Federal Claims concluded that Appellants had "failed to state a takings claim," because its "bump-stock devices were not taken for a public use, but were instead prohibited through the government's exercise of its police power" and, further, "[e]ven if the police power doctrine were inapplicable," it "would nonetheless dismiss the complaint because there [wa]s no merit to [Appellants'] argument that the [Bump Stock] [R]ule effected a categorical taking of [its] bump-stock devices." *Id.* at 53. The Court of Federal Claims concluded that Appellants suffered neither a physical taking, *id.* at 53–55, nor a regulatory taking of their bump stocks, *id.* at 55–56 (noting that Appellants had failed to raise any regulatory taking arguments and that, "even if the argument were not waived, [Appellants] ha[d] failed to state a regulatory takings claim").

There is no dispute that the Court of Federal Claims correctly concluded that Mr. McCutchen and Paducah failed to state a compensable takings claim. However, as I explain below, I do not agree with the majority's reasoning that the *Lucas* "inhere in title" exception should extend to dangerous and unusual weapons. *See* Maj. Op. at 4, 16–17. In my view, the police power doctrine supports affirming the decision of the Court of Federal Claims. For the reasons which follow, I agree with the Court of Federal Claims that the Bump Stock Rule was "an exercise of police power and did not effect a taking for public use." *McCutchen*, 145 Fed. Cl. at 51 (capitalization normalized).

## II. THE "INHERE IN TITLE" EXCEPTION IS NOT THE PROPER VEHICLE TO ASCERTAIN WHETHER MR. MCCUTCHEN AND PADUCAH FAILED TO STATE A COMPENSABLE TAKINGS CLAIM

*Lucas* holds that a "categorical" takings analysis is appropriate "where regulation denies all economically beneficial or productive use of land." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992); *see id.* at 1015–16 ("As we have said on numerous occasions, the Fifth Amendment is violated when land-use regulation . . . *denies an owner economically viable use of his land.*" (emphasis in original) (internal quotation marks and citation omitted)). The cases in which the Supreme Court has applied *Lucas's* total takings rule have involved real property, and Circuit Courts have not reached a clear consensus on how broadly to apply *Lucas's* per se rule. *See Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017) ("By declaring that the denial of all economically beneficial use of land constitutes a regulatory taking, *Lucas* stated what it called a 'categorical' rule."); *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 330 (2002) ("[O]ur holding [in *Lucas*] was limited to 'the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted.'" (emphasis in original) (quoting *Lucas*, 505 U.S. at 1017)); *A & D Auto Sales, Inc. v. United States*, 748 F.3d

1142, 1151–52 (Fed. Cir. 2014) (noting the question and collecting cases).

However, *Lucas* understands its categorical rule to be an application of the Supreme Court's prior land-use regulation cases, *see Lucas*, 505 U.S. at 1015 (citing *Agins v. City of Tiburon*, 447 U.S. 255, 260 (1980), *abrogated by Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005); *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 834 (1987); *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495 (1987); *Hodel v. Virginia Surface Mining & Reclamation Ass'n., Inc.*, 452 U.S. 264, 295–96 (1981)), and limited by "background principles of nuisance and property law that prohibit [specific] uses" of real property, *id.* at 1031. As such, "a landowner may not recover for a taking when the government forbids a use that is a nuisance at common law." *A & D Auto Sales*, 748 F.3d at 1152 (citing *Lucas*, 505 U.S. at 1029–30). "The law of nuisance inheres in the landowner's title, so there is no taking if a use restriction falls within the scope of nuisance law." *Id.* (citing *Lucas*, 505 U.S. at 1029–30).

As such, *Lucas* itself expressly declines to extend its reasoning to the regulation of personal property. *Lucas*, 505 U.S. at 1028; *see Horne v. Dep't of Agric.*, 576 U.S. 350, 361–62 (2015) (clarifying that *Lucas's* per se regulatory taking analysis applies to real property). *Lucas* contrasts real property, which it concludes is subject to its per se regulatory taking rule, with "personal property," which is not subject to the same per se rule. *Lucas*, 505 U.S. at 1028; *see Horne*, 576 U.S. at 361–62. The contrast makes sense, as real property is afforded greater protections than personal property. *See Lucas*, 505 U.S. at 1027–28 ("[H]e ought to be aware of the possibility that new regulation might . . . render his property economically worthless" "by reason of the [government's] traditionally high degree of control over commercial dealings[.]" (citing *Andrus v. Allard*, 444 U.S. 51, 66–67 (1979))); *see Andrus*, 444 U.S. at 66–67 (finding no regulatory takings even where

"regulations . . . prevent[ed] the most profitable use of [the owners' personal] property").

Bearing in mind that *Lucas* warns that personal property owners "ought to be aware of the possibility that new regulation might . . . render [their] property economically worthless" "by reason of the [government's] traditionally high degree of control over commercial dealings," *Lucas*, 505 U.S. at 1027–28, this court has "applied the categorical test to personal property [only] on occasion," *A & D Auto Sales*, 748 F.3d at 1151. Accordingly, this court has cautiously examined the "inhere title" exception in cases involving non-physical personal property, specifically, liens, permits, or higher statutory dividend rates. *See American Bankers Ass'n v. United States*, 932 F.3d 1375, 1384–86 (Fed. Cir. 2019) (concluding that plaintiffs had no property interest in a higher statutory dividend rate on Federal Reserve stock); *A & D Auto Sales*, 748 F.3d at 1151–52 (declining to decide the issue of whether *Lucas* should extend to "intangible [personal] property"); *Bair v. United States*, 515 F.3d 1323, 1327 (Fed. Cir. 2008) (concluding that the "inhere in title" exception did apply to federal statutory processor liens); *Conti v. United States*, 291 F.3d 1334, 1343 (Fed. Cir. 2002)(concluding that a swordfishing permit did not constitute a cognizable property interest).

I fear that the majority has overread our case law by extending *Lucas's* per se regulatory taking analysis to dangerous and unusual weapons; here, bump stocks. The majority cites cases that appear inapplicable here; those cases address non-physical personal property—not physical personal property, like bump stocks. *See* Maj. Op. at 15–18 (citing *Dames & Moore v. Regan*, 453 U.S. 654, 674 n.6 (1981) (discussing whether the petitioner acquired a property interest in its attachment against foreign banks' assets); *American Bankers Ass'n*, 932 F.3d 1375, 1384–85 (discussing whether plaintiff had a property interest in a higher statutory dividend rate); *A & D Auto Sales*, 748 F.3d at 1152–53 (discussing whether *Lucas* should extend to

"intangible [personal] property"); *Bair*, 515 F.3d at 1327 (discussing whether plaintiff had property interest in statutory processor liens)).  Additionally, the majority does not cite a single case where a court concluded that a claimant did not have a cognizable property interest in physical property.  *See* Maj. Op. at 15–18.  Such an overextension of our case law may inadvertently afford dangerous and unusual weapons special protections that are reserved to real property and limited instances of personal property, as discussed in *Lucas*.  Consequently, in my opinion, the "inhere in title" exception is an inappropriate vehicle to ascertain whether Mr. McCutchen and Paducah failed to state a compensable takings claim.  Instead, for the reasons to follow, I would affirm under the police powers doctrine.

### III.  MR. MCCUTCHEN AND PADUCAH'S TAKINGS CLAIMS ARE PRECLUDED BY THE POLICE POWERS DOCTRINE

The Court of Federal Claims concluded that the Bump Stock Rule "did not effect a taking for public use" under the police powers doctrine.  *McCutchen*, 145 Fed. Cl. at 51 (capitalization normalized).  The Court of Federal Claims explained that "it is well established that there is no [compensable] taking for 'public use' where," as here, "the government acts pursuant to its police power" to "criminalize[] or otherwise outlaw[] the use or possession of property that presents a danger to the public health and safety."  *Id.* (citing *Keystone Bituminous*, 480 U.S. at 491; *Miller v. Schoene*, 276 U.S. 272, 279–80 (1928); *Mugler v. Kansas*, 123 U.S. 623, 668–69 (1887); *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1153 (Fed. Cir. 2008)).  Mr. McCutchen and Paducah argue that the Court of Federal Claims "erred" when it "determin[ed] that [their] property was not taken 'for public use'" under the police powers doctrine.  Appellants' Br. 9.  I disagree with Appellants.

"Long ago" the Supreme Court "recognized that 'all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the

community'" and that "the Takings Clause did not transform that principle to one that requires compensation whenever the [government] asserts its power to enforce" that implied obligation. *Keystone Bituminous*, 480 U.S. at 491–92 (quoting *Mugler*, 123 U.S. at 665). Accordingly, certain government actions in furtherance of the health, safety, and general welfare of the public have a "special status" within our takings jurisprudence. *Id.* at 491& n.20; *see id.* at 491 n.20 (explaining that "since no individual has a right to use his property so as to create a nuisance or otherwise harm others, the [government] has not 'taken' anything when it asserts its power to enjoin the nuisance-like activity"); *see also Ruckelshaus*, 467 U.S. at 1005 (concluding that a health and safety regulation's lack of "interference with reasonable investment-backed expectations" was "so overwhelming . . . that it disposes of the taking question" (internal quotation marks and citation omitted)). Courts have sometimes described such actions as a "legitimate exercise of the government's police power," rather than a compensable taking, *Murr*, 137 S. Ct. at 1947, or as non-compensable under the "police power doctrine," *Akins v. United States*, 82 Fed. Cl. 619, 622 (2008); *see AmeriSource*, 525 F.3d at 1153.[1]      Rather    than    being

---

[1]    This nomenclature has its roots in the Supreme Court's early police power cases, prior to the advent of its regulatory takings jurisprudence, when a regulation pursuant to the government's "police power" did not effect a compensable taking. *Murr*, 137 S. Ct. at 1942–47; *see Horne*, 576 U.S. at 360 ("Prior to th[e Supreme] Court's decision in [*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922)], the Takings Clause was understood to provide protection only against a direct appropriation of property—personal or real."). In *Pennsylvania Coal*, the Supreme Court held that "[t]he general rule" is that "if regulation goes too far it will be recognized as a taking." 260 U.S. at

compensable, "loss due to an exercise of the police power is properly treated as part of the burden of common citizenship." *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5 (1949); *see Andrus*, 444 U.S. at 65 ("The Takings Clause . . . preserves governmental power to regulate, subject only to the dictates of justice and fairness." (internal quotation marks and citation omitted)). For example, "[c]ourts have consistently held that [the government] need not provide compensation when it diminishes or destroys the value of property by stopping illegal activity or abating a public nuisance." *Keystone Bituminous*, 480 U.S. at 492 n.22; *see Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1347 (Fed. Cir. 2004). Similarly, "[w]hen property has been seized pursuant to the criminal laws or subjected to in rem forfeiture proceedings, such deprivations are not [compensable] takings." *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1331 (Fed. Cir. 2006) (internal quotation marks omitted) (citing *Bennis v. Michigan*, 516 U.S. 442, 452–53 (1996); *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 680 (1974); *Van Oster v. Kansas*, 272 U.S. 465, 468 (1926)).

The Court of Federal Claims correctly concluded that the Bump Stock Rule was not a compensable taking under the police powers doctrine. Congress enacted the National Firearms Act ("NFA") and Gun Control Act ("GCA") to regulate "lethal weapons," particularly machine guns, "[that] could be used readily and efficiently by criminals." H.R. REP. NO. 83-1337, at A395 (1954); *see* GCA, Pub. L. 90-618, sec. 101, 82 Stat. 1213 (1968); S. REP. NO. 89-1866, at 1 (1966); *see also National Firearms Act: Hearing on H.R. 9066 Before the H. Comm. On Ways and Means*, 73d Cong.

---

415; *see Lucas*, 505 U.S. at 1026 (explaining that in *Pennsylvania Coal*, the Supreme Court established that there are "limits to the noncompensable exercise of the police power").

2d Sess. 4–6 (1934) (statement of the Hon. Homer S. Cummings Attorney General of the United States) ("A machine gun, of course, ought never to be in the hands of any private individual.  There is not the slightest excuse for it . . . and we must, if we are going to be successful in this effort to suppress crime in America, take these machine guns out of the hands of the criminal class."); H.R. REP. NO. 99-495, at 1–2 (1986) (explaining that the Firearm Owners Protection Act was intended to amend certain provisions of the Gun Control Act to, inter alia "enhance the ability of law enforcement to fight violent crime," including placing "[c]ontrols [on] all parts designed or intended to be use for converting weapons into machine guns").  The Bump Stock Rule, "[b]y making clear that [bump stocks] are subject to the restrictions that the NFA and GCA place on machineguns, . . . reflect[ed] the public safety goals of those statutes."  Bump-Stock-Type Devices, 83 Fed. Reg. 66,514, 66,520 (Dec. 26, 2018) ("Bump-Stock Rule").  In particular, the Bump Stock Rule sought to "ameliorate th[e] threat" to the public posed by bump stocks, Bump-Stock-Type Devices, 83 Fed. Reg. 13,442, 13,447 (Mar. 29, 2018) ("Notice"), as devices "designed to be affixed to semiautomatic long gun . . . for the express purpose of allowing 'rapid fire' operation," Bump Stock Rule, 83 Fed. Reg. at 66,516; *see id.* at 66,520 ("[A] bump-stock-type device combined with a semiautomatic firearm can empower a single individual to take many lives in a single incident."); Notice, 83 Fed. Reg. at 13,447 (explaining that the Las Vegas mass shooting "made many individuals aware that these devices exist—potentially including persons with criminal or terrorist intentions—and made their potential to threaten public safety obvious").

Further, the ATF promulgated the Bump Stock Rule pursuant to its statutory authority to make such regulations necessary to enforce the NFA and GCA.  Bump Stock Rule, 83 Fed. Reg. at 66,515–16; *see* 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a), 7805(a); 28 C.F.R. § 0.130(a)(1)–(2).  The

Bump Stock Rule clarified that bump stocks fall within the statutory term "machinegun," because they "convert an otherwise semiautomatic firearm into a machinegun," and therefore, also fall within the criminal prohibition on the transfer and possession of machine guns.  Bump Stock Rule, 83 Fed. Reg. at 66,514; *see id* at 66,521 (providing that the ATF has "initiated this rulemaking to clarify the regulatory interpretation of the NFA and GCA" and that "the purpose of th[e Bump Stock R]ule is to clarify that such devices are machineguns under the NFA"); *see also* 18 U.S.C. § 922(o); 26 U.S.C. § 5845(b); 27 C.F.R. §§ 447.11, 478.11, 479.11.  "[W]illful violation" of this prohibition results in the "seizure and forfeiture" of the machine gun.  18 U.S.C. § 924(d)(1); *see id.* § 924(a)(2); 26 U.S.C. § 5872(a)–(b).  Accordingly, in requiring that "possessors of [bump-stock] devices . . . destroy the devices or abandon them at an ATF office prior to the effective date of the [Bump Stock R]ule," Bump Stock Rule, 83 Fed. Reg. at 66,514, the ATF acted pursuant to its authority to "administer[] and enforce the laws related to" firearms, 28 C.F.R. § 0.130(a)(1)–(2); *see* 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a), 7805(a); 27 C.F.R. §§ 479.181, 479.182—specifically, to enforce the criminal prohibition on the transfer and possession of machine guns manufactured after 1986, 18 U.S.C. §§ 922(o), 924(d)(1); *see* Bump Stock Rule, 83 Fed. Reg. at 66,514.

"[T]he cases authorizing" such government action without compensation are "firmly fixed in the punitive and remedial jurisprudence of the country." *Bennis*, 516 U.S. at 453 (internal quotation marks and citation omitted).  In promulgating the Bump Stock Rule, the ATF acted pursuant to a well-established regulatory regime and in consonance with a known "limitation on the right to keep and carry arms"—"the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" including machine guns. *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008) (citing, inter alia, 4 Commentaries on the Laws of England 148–49 (1769); *State v. Langford*, 10 N.C. 381,

383–84 (1824))[2]; *see* 18 U.S.C. §§ 922(o), 924(d)(1), 926(a); 26 U.S.C. §§ 7801(a), 7805(a); 27 C.F.R. §§ 479.181, 479.182; 28 C.F.R. § 0.130(a)(1)–(2); *see also* Bump Stock Rule, 83 Fed. Reg. at 66,522 (collecting cases and noting that "lower courts have consistently upheld prohibitions on machine guns"). Further, in requiring Appellants abandon or destroy their bump stocks, the ATF acted "under the exercise of governmental authority other than the power of eminent domain," *Bennis*, 516 U.S. at 452—the government's authority to "seize[] [property] pursuant to . . . criminal laws" and "to condemn contraband . . . goods," *Acadia*, 458 F.3d at 1331–32; *see* 18 U.S.C. §§ 924(a)(2), (d)(1); 26 U.S.C. § 5872(a)–(b); *see also Bennis*, 516 U.S. at 452–53 (noting the Supreme Court's "longstanding practice" of neither requiring compensation for, nor finding unconstitutional, seizures, forfeitures, and abatements of personal property "to deter illegal activity," even of an "innocent owner"); *Calero-Toledo*, 416 U.S. at 683 (tracing in rem forfeiture proceedings against contraband personal property from "[l]ong before the adoption of the Constitution" to "contemporary [F]ederal and state forfeiture statutes" that "reach virtually any type of property that might be used in the conduct of a criminal enterprise").

"While it is insufficient to avoid" the Takings Clause "to invoke the 'police powers' of the state," the prohibition of dangerous and unusual weapons, and the enforcement of that prohibition through the criminal laws, "is the kind of exercise of the police power that has repeatedly been treated as legitimate even in the absence of compensation."

---

[2]    *See, e.g.*, *Langford*, 10 N.C. at 383–84 ("[W]hen a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people; which is said always to have been an offence at common law, and is strictly prohibited by statute." (citation omitted)).

*Acadia*, 458 F.3d at 1332–33; *see Bennis*, 516 U.S. at 453; *Calero-Toledo*, 416 U.S. at 683. Mr. McCutchen and Paducah, therefore, lack a compensable takings claim for their bump stocks against the Bump Stock Rule, because it is precluded by the police powers doctrine. Accordingly, the Bump Stock Rule's requirement that possessors destroy or relinquish their bump stocks as illegal machine guns is not a taking of "private property . . . for public use, without just compensation." U.S. CONST. amend. V, cl. 4.

Mr. McCutchen and Paducah's counterarguments are unpersuasive. First, Appellants argue that the "'police powers' exception" is inapplicable here because the doctrine only applies when the "government acts in its enforcement capacity, e.g., when it enforces an *existing* criminal or remedial statutory scheme, not when [the] government acts in its legislative capacity to readjust legal rights." Appellant's Br. 7; *see id.* at 7–8 (asserting that *Guedes* held that the Bump Stock Rule was not an "enforcement action" but "an exercise of the ATF's legislative authority to make new law" (citing *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 17–21 (D.C. Cir.), *judgment entered*, 762 F. App'x 7 (D.C. Cir. 2019), and *cert. denied*, 140 S. Ct. 789 (2020)), 18 (asserting that the "*Bennis* line of cases has no bearing on [Mr. McCutchen and Paducah's] Fifth Amendment claims" because the ATF, in requiring they destroy or surrender their bump stocks, was acting "under its legislative authority to make new law" (citing *Gibson Wine Co. v. Snyder*, 194 F.2d 329, 331 (D.C. Cir. 1952)))). This argument is without merit.

Appellants ignore that the Bump Stock Rule was promulgated to enforce an existing criminal law—the prohibition on transfer and possession of machine guns, including parts designed to convert weapons into a machine gun, manufactured after 1986. 18 U.S.C. § 922(o); 26 U.S.C. § 5845(b); 27 C.F.R. §§ 447.11, 478.11, 479.1126; *see* Bump Stock Rule, 83 Fed. Reg. at 66,536–37 (explaining that "[b]ecause bump-stock-type devices are properly classified

as 'machineguns' under the NFA and GCA, . . . [the] ATF must regulate them as such" and "does not have the authority to restrict only the future manufacture and sale of bump-stock-type devices" or "remove the general prohibition on the transfer and possession of machineguns that were not lawfully possessed" prior to 1986). Appellants also fail to recognize that the ATF acted within an established regulatory regime, pursuant to delegated and retained discretion, to conclude that Appellants' bump stocks "allow a shooter of a semiautomatic firearm to initiate a continuous firing cycle with a single pull of the trigger" and to classify Appellants' bump stocks as illegal machine guns. Bump Stock Rule, 83 Fed. Reg. at 66,515–16; *see id.* at 66,520 ("The reason for the [ATF's] classification change is that ATF, upon review . . . believes that bump-stock-type devices must be regulated because they satisfy the statutory definition of 'machinegun' in the NFA and GCA."); *see also* 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a), 7805(a); 27 C.F.R. §§ 478.1, 479.1, 489.1; 28 C.F.R. § 0.130(a)(1)–(2); NFA Handbook §§ 7.2.4, 7.2.4.1; *Akins v. United States*, 312 F. App'x 197, 200 (11th Cir. 2009); *Akins v. United States*, No. 8:08-CV-988-T-26TGW, 2008 WL 11455059, at *8 (M.D. Fla. Sept. 23, 2008), *aff'd*, 312 F. App'x 197 (11th Cir. 2009). Appellants misunderstand that, having classified bump stocks as illegal machine guns, the ATF acted in its enforcement capacity when it required Appellants abandon or destroy their bump stocks—specifically, to enforce the criminal prohibition on the possession of illegal machine guns. Bump Stock Rule, 83 Fed. Reg. at 66,530 (providing that "enforcement of and compliance with" the Bump Stock Rule requires "possessors of bump-stock-type devices . . . to dispose of the[ir] devices"), 66,539 (providing that failure to comply by the "effective date" will result in "violation of Federal law"), 66,544 (explaining that "this rulemaking aims to apply Congress's policy decision to prohibit machineguns"); *see* 18 U.S.C. §§ 922(o), 924(d)(1); 26 U.S.C. §§ 5872(a)–(b), 7801(a), 7805(a); 27 C.F.R. §§ 447.63, 478.152, 479.182; 28 C.F.R. § 0.130(a)(1)–(2); *cf.*

Appellants' Br. 15 (agreeing that "[t]he government is not required to pay compensation for a taking when a property owner is deprived of his property rights as a consequence of a government enforcement action." (citing *Bennis*, 516 U.S. at 442)).

Second, Mr. McCutchen and Paducah assert that the Court of Federal Claims erred because "[t]he Supreme Court's early 'police powers' cases do not defeat the public use prong of [their] claims." Appellants' Br. 11 (citing *Miller*, 276 U.S. 272; *Mugler*, 123 U.S. 623). They argue that "the 'harmful or noxious use' principle," articulated in the "*Miller* and *Mugler* cases was nothing more than the Supreme Court's early formulation of the police power justifying a regulatory *diminution in value* of property without compensation," *id.* (citing *Lucas*, 505 U.S. at 1004), and therefore inapplicable to the "total[] depriv[ation] of their property" effected by the Bump Stock Rule, *id.* at 14. This argument is without merit.

As an initial matter, the police power doctrine is not directed to the "public use" prong of our takings analysis. The police power doctrine is directed to the question of whether property has been "taken." *Keystone Bituminous*, 480 U.S. at 491 n.20. If property has not been taken, then compensation is not required. *See Lingle*, 544 U.S. at 536–37. The public use prong is directed to whether property, having been taken, was taken for a "public use." *See id.* at 543. If property has not been taken for "public use," then "[n]o amount of compensation can authorize [the] action." *Id.*; *see Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 239 (1984). The police power doctrine is premised "on the simple theory that since no individual has a right to use his property so as to create a nuisance or otherwise harm others, the [s]tate has not 'taken' anything when it asserts its power to enjoin the nuisance-like activity." *Keystone Bituminous*, 480 U.S. at 491 n.20; *see Bennis*, 516 U.S. at 453; *Acadia*, 458 F.3d at 1331. It focuses on specific exercises of the police power in furtherance of the health, safety, and

general welfare of the public. *Keystone Bituminous*, 480 U.S. at 491–92; *see Berman v. Parker*, 348 U.S. 26, 32 (1954) (explaining that "[p]ublic safety" and "public health" are "some of the more conspicuous examples of the traditional application of the police power," and therefore "they merely illustrate the scope of the power and do not delimit it"). In contrast, the public use prong seeks to prevent the government from taking property "for the purpose of conferring a private benefit on a particular private party." *Kelo v. City of New London, Conn.*, 545 U.S. 469, 477 (2005). It focuses broadly on whether a taking is for "public purpose," *id.* at 480, and, therefore, unlike the police powers doctrine, is "coterminous" with the full "scope of a sovereign's police powers," *Midkiff*, 467 U.S. at 240; *see id.* at 239 ("An attempt to define [the police powers'] reach or trace its outer limits is fruitless, for each case must turn on its own facts." (quoting *Berman*, 348 U.S. at 32)); *Kelo*, 545 U.S. at 483 ("[Supreme Court] public use jurisprudence has wisely eschewed rigid formulas and intrusive scrutiny in favor of affording legislatures broad latitude in determining what public needs justify the use of the takings power.").

More substantively, Appellants misunderstand the import of the Supreme Court's early police power cases to our analysis here. We do not need to analogize solely from cases about the state-mandated closure of breweries, *see Mugler*, 123 U.S. at 623, and compelled destruction of diseased cedar trees, *see Miller*, 276 U.S. at 279–80, to conclude that the government may ban dangerous and unusual weapons, *see Heller*, 554 U.S. at 627, and enforce that ban without compensation, *see Bennis*, 516 U.S. at 452–53; *Calero-Toledo*, 416 U.S. at 683; *Acadia*, 458 F.3d at 1331–32. Rather, because the Supreme Court's takings jurisprudence has "traditionally been guided" by the reasonable expectations of property owners, we may look to these early cases to establish that, "[a]s long recognized, some values are enjoyed under an implied limitation and

must yield to the police power." *Lucas*, 505 U.S. at 1027 (quoting *Pennsylvania Coal*, 260 U.S. at 413); *see, e.g.*, *Keystone Bituminous*, 480 U.S. at 490 (explaining that in *Miller*, 276 U.S. 272, the Supreme Court concluded that "the Takings Clause did not require the [state] to compensate the owners of cedar trees for the value of the trees that the [s]tate had ordered destroyed," because "it was clear that the [s]tate's exercise of its police power to prevent the impending danger was justified, and did not require compensation"), 491–92 (quoting *Mugler*, 123 U.S. at 665, for the proposition that "[l]ong ago it was recognized that 'all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community'"); *Allied-Gen. Nuclear Servs. v. United States*, 839 F.2d 1572, 1576 (Fed. Cir. 1988) (noting that in *Keystone Bituminous* "the Supreme Court has dusted off *Mugler* and put it back on its pedestal").

Further, contrary to Appellants' arguments, the Supreme Court's early police-power cases are not limited to the "diminution of rights" through "government regulation of use," Appellants' Br. 14, but instead confirm the government's longstanding authority to regulate personal property, even to "the destruction of [that] property," without a categorical duty to compensate. *Samuels v. McCurdy*, 267 U.S. 188, 196 (1925). For example, in *Samuels*, the Supreme Court concluded that the seizure of "certain intoxicating liquors" pursuant to a state's criminal prohibition, even to "the destruction of property" and disappointment of a previously legal interest, was not a compensable taking because the case did "not involve the power of eminent domain," but the "police power." *Id.* at 190, 195–96. Similarly, in *Omnia Com. Co. v. United States*, the Supreme Court concluded that Federal requisition of a "steel company's entire production of steel plate for the year 1918" was not a compensable taking of another company's preexisting contract to buy that steel, as the "destruction of, or injury to, property is frequently accomplished without a

'taking' in the constitutional sense." 261 U.S. 502, 507–08 (1923). Thus, the early police power cases support the conclusion that "not every destruction or injury to property by governmental action" is a "'taking' in the constitutional sense," *Armstrong v. United States*, 364 U.S. 40, 48 (1960), but rather may be a non-compensable exercise of the police power, *Lucas*, 505 U.S. at 1027 (explaining that "some values . . . must yield to the police power" (quoting *Pennsylvania Coal*, 260 U.S. at 413)); *Chicago, B. & Q. Ry. Co. v. Illinois*, 200 U.S. 561, 594 (1906) (explaining that the Takings Clause "is not intended as a limitation of the exercise of those police powers which are necessary to the tranquility of every well-ordered community" as "[i]t has always been held that the legislature may make police regulations, although they may interfere with the full enjoyment of private property, and though no compensation is given" (citation omitted)); *see, e.g.*, *Juragua Iron Co. v. United States*, 212 U.S. 297, 305 (1909) (concluding that Takings "principle[s]" could not "be enforced in respect of [real and personal] property destroyed by the United States in the course of military operations for the purpose . . . of protecting the health and lives of its soldiers," specifically, in the belief that it would prevent the spread of infectious disease); *Bowditch v. City of Bos.*, 101 U.S. 16, 18–19 (1879) (finding no compensable taking for the destruction of property to prevent the spread of fire, explaining that "[a]t the common law every one had the right to destroy real and personal property, in cases of actual necessity, to prevent the spreading of a fire" with "the common law adopt[ing] the principle of the natural law, and find[ing] the right and the justification in the same imperative necessity"). Accordingly, the Court of Federal Claims correctly concluded that the Bump Stock Rule was not a compensable taking under the police powers doctrine.

## IV. CONCLUSION

I would affirm the decision of the Court of Federal Claims that, "[Mr. McCuthcen and Paducah's] bump-stock

devices were not taken for a public use, but were instead prohibited through the government's exercise of its police power." *McCutchen*, 145 Fed. Cl. at 53.  I therefore concur in today's result.