**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1584**

MITCH RANDALL YAWN; JUANITA MAE STANLEY, d/b/a Flowertown Bee
Farm and Supplies,

Plaintiffs - Appellants,

v.

DORCHESTER COUNTY,

Defendant - Appellee

and

TOWN OF SUMMERVILLE; ALLEN AVIATION, INC.; AL ALLEN,

Defendants.

Appeal from the United States District Court for the District of South Carolina, at
Charleston.  Margaret B. Seymour, Senior District Judge.  (2:17-cv-00440-MBS)

Argued:  May 6, 2021                                    Decided:  June 11, 2021

Before KING and THACKER, Circuit Judges, and TRAXLER, Senior Circuit Judge.

Affirmed by published opinion.  Judge Thacker wrote the opinion, in which Judge King
joined.  Judge Traxler wrote a concurring opinion.

**ARGUED:**   J. David Breemer, PACIFIC LEGAL FOUNDATION, Sacramento,
California, for Appellants.  Amanda R. Maybank, MAYBANK LAW FIRM, LLC,

Charleston, South Carolina, for Appellee. **ON BRIEF:** W. Andrew Gowder, Jr., AUSTEN & GOWDER, LLC, Charleston, South Carolina; Michael T. Rose, MIKE ROSE LAW FIRM, PC, Summerville, South Carolina; Kathryn D. Valois, PACIFIC LEGAL FOUNDATION, Palm Beach Gardens, Florida, for Appellants. Roy P. Maybank, Marshall A. Earhart, MAYBANK LAW FIRM, LLC, Charleston, South Carolina, for Appellee.

_____

THACKER, Circuit Judge:

Juanita Stanley and Mitch Yawn ("Appellants") sued Dorchester County, South Carolina (the "County"), seeking compensation pursuant to the Takings Clause of the Fifth Amendment for the death of their bees. According to Appellants, because the bees died after the County sprayed pesticide in an effort to kill mosquitos, the bees' death amounted to a taking of Appellants' private property. The district court granted the County's motion for summary judgment, holding that there was no taking because the loss of Appellants' bees was only an incidental consequence of the County's action. We affirm.

## I.

## A.

In 2016, South Carolina state government officials from the Department of Health and Environmental Control ("DHEC") "urged local jurisdictions to bolster their mosquito control programs heading into the summer months in preparation for a possible Zika virus outbreak." J.A. 195.[*] The Zika virus is a mosquito born illness with the potential "to cause serious fetal brain defects" and was confirmed to be present in South Carolina as of May 2016. *Id.*

By August 2016, three cases of travel related Zika virus were reported in the County. The DHEC responded to the confirmed cases by directing the head of the County's Mosquito Abatement Division, Clayton Gaskins, to spray pesticide in targeted areas within

---

[*] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

a certain radius of the Zika-infected individuals' homes. As a result, Gaskins set about to deploy the County's two spray trucks to treat the areas with pesticide.

However, upon visiting the treatment areas, Gaskins determined that there were multiple heavily wooded places within the target areas that could not be reached by the spray trucks. Thus, Gaskins consulted with his supervisor and the County Administrator as to the best course of action. The three of them determined that aerial pesticide spray should be recommended to the County Council because of the inability of the trucks to fully access the DHEC's target areas, as well as numerous citizen reports of excessive mosquitos in the area. According to the 2016 County Council Chairman, the Council had heard from constituents favoring the use of aerial spray to combat the spread of the Zika virus. *See* J.A. 113 (describing the first Council discussion on aerial spraying where a constituent "begged and pleaded" for the aerial spray to be conducted). Ultimately, the County Council approved aerial spray and established a contract with Allen Aviation to conduct the spray.

The aerial spray was scheduled to take place on August 28, 2016, between the hours of 6:30 a.m. and 8:30 a.m. In accord with South Carolina law, the County issued a press release on August 26, 2016, to notify the citizens of the upcoming aerial spray. The press release was issued to numerous media outlets, including local television stations, newspapers, radio stations, and social media platforms. But Appellants were not aware of the press release prior to the aerial spray.

Additionally, although not required by law or County policy, as a courtesy, Gaskins took it upon himself to call local beekeepers before the pesticide sprays. As local

beekeepers, Appellants were on the call list, and had been previously called about upcoming sprays. However, they did not receive a call from Gaskins prior to the August 28 aerial spray. Thus, Appellants did not implement protective measures for their bees before the spray as they had successfully done in the past.

In preparing for the aerial spray, the County provided Allen Aviation with mosquito abatement zone maps, as well as a map that included the location of all beekeepers in the area. During discovery, the pilot who conducted the spray, an Air Force veteran and certified agriculture pilot, testified in a deposition that he used the maps provided by the County with markers to identify the beehive locations in order to determine when to turn off the sprayer during the flight. The pilot also testified that he specifically remembered turning off the sprayer as he approached the beehive locations marked on the map.

Nonetheless, the morning after the aerial spray, Appellants discovered mounds of dead bees surrounding their hives. Appellants contacted Clemson University, Department of Pesticide Regulation ("Clemson DPR"), the entity responsible for regulating and investigating pesticide use and complaints pursuant to state law. The Clemson DPR investigated and found "bees with behaviors consistent with pesticide exposure" as well as "very active bees flying around the yard." J.A. 150. The investigation included collecting and testing representative samples of dead bees and soil from around the hives, which the Clemson DPR discovered did not contain pesticide residue. However, the report indicated the lack of pesticide residue "likely occurred due to the time which elapsed between the application and when the samples were obtained, combined with [the pesticide]'s ability to rapidly degrade under typical environmental conditions." *Id.* at 152. Thus, although the

5

investigation "found no [regulatory] violations occurred" during the August 28 aerial spray, it also did not rule out the aerial spray "as a cause for the loss of the bees." *Id.* at 152–53.

B.

Appellants filed a lawsuit against the County on January 27, 2017, alleging that the aerial spray of pesticide and subsequent death of the bees amounted to a taking pursuant to the Takings Clause of the Fifth Amendment. Appellants also brought claims pursuant to the South Carolina state constitution and the South Carolina Tort Claims Act. The County moved for summary judgment on December 16, 2019. Concluding there was no taking, the district court granted the County's motion for summary judgment on the Takings Clause claim.

The district court began its takings analysis by noting the distinction between the power of eminent domain and police power. *See* J.A. 249 (explaining police power "extends to all matters affecting the public health or the public morals" (quoting *Stone v. Mississippi*, 101 U.S. 814, 818 (1879))). The district court held:

> It is undisputed that the spray was conducted to prevent the spread of disease, a matter that would affect public health. Such an action fits squarely within the state's police power. "If the injury complained of is only incidental to the legitimate exercise of governmental powers for the public good, then there is not taking of property for the public use, and a right to compensation, on account of such injury, does not attach under the Constitution." *Chicago, B. & Q. Ry. Co. v. People of State of Illinois*, 200 U.S. 561, 593–94 (1906). The loss of [Appellants'] bees was unintentional; it was an unfortunate consequence to a proper exercise of [the County]'s police power. Because [the County] was exercising its police power,

6

and not its power of eminent domain, the Takings Clause is not implicated.

J.A. 252. Therefore, the district court concluded Appellants "are not entitled to federal compensation" and granted summary judgment in favor of the County on the Takings Clause claims. *Id.* Appellants' state law claims were remanded to state court for further consideration.

## II.

"We review the district court's grant of summary judgment de novo . . . ." *Providence Square Assocs. v. G.D.F., Inc.*, 211 F.3d 846, 850 (4th Cir. 2000). Summary judgment "is appropriate where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." *Id.* (quoting *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999)).

## III.

## A.

"The Takings Clause is 'designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole'" by requiring just compensation when private property is taken for public use. *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). When reviewing Takings Clause jurisprudence, the Supreme Court has "recognized . . . that no magic formula enables a court to judge, in every case, whether a given government interference with property is a taking." *Id.* Indeed, because of "the nearly infinite variety of ways in which government actions or regulations

7

can affect property interests, the Court has recognized few invariable rules in this area."
*Id.*

Appellants contend the district court erred because its ruling "amounts to the conclusion that, when government interferes with property to preserve public health, safety or welfare, it is immune from the Takings Clause." Appellants' Br. 19. In essence, Appellants argue that the district court adopted a per se rule excusing the Government from Takings Clause analysis when it acts pursuant to the police power. In Appellants' view, this violates the Supreme Court's caution against "the temptation to adopt what amount to per se rules in either direction[, which] must be resisted." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 342 (2002) (internal quotation marks omitted).

That Government actions taken pursuant to the police power are not per se exempt from the Takings Clause is axiomatic in the Supreme Court's jurisprudence. "Time and again in Takings Clause cases, the Court has heard the prophecy that recognizing a just compensation claim would unduly impede the government's ability to act in the public interest." *Ark. Game & Fish*, 568 U.S. at 36. The Court has consistently "rejected this argument when deployed to urge blanket exemptions from the Fifth Amendment's instruction." *Id.* at 37 ("While we recognize the importance of the public interests the Government advances in this case, we do not see them as categorically different from the interests at stake in myriad other Takings Clause cases."); *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014 (1992) ("If, instead, the uses of private property were subject to unbridled, uncompensated qualification under the police power, the natural tendency of human nature would be to extend the qualification more and more until at last private

property disappeared." (internal quotation marks omitted)). Nevertheless, we affirm the district court's grant of summary judgment because the death of Appellants' bees was neither intentional nor foreseeable.

B.

"If the injury complained of is only incidental to the legitimate exercise of governmental powers for the public good, then there is no taking of property for the public use, and a right to compensation, on account of such injury, does not attach under the Constitution." *Chicago, B. & Q. Ry. Co. v. Illinois*, 200 U.S. 561, 593–94 (1906). Thus, we must determine "the degree to which the invasion is intended or is the foreseeable result of authorized government action." *Ark. Game & Fish*, 568 U.S. at 39. If the invasion is not intended or foreseeable, then it does not constitute a taking. *See id*; *see also Moden v. United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005) (explaining that a claim based on chemical contamination of real property "must show either that the government intended to invade a protected property interest or that the asserted invasion is the direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the activity").

Here, the death of Appellants' bees was plainly unintentional. The County's stated objective was to abate mosquitos in an effort to prevent the spread of the Zika virus. More importantly, the County took specific measures to avoid the unfortunate death of the bees. The County issued a press release to a wide array of media outlets before spraying. The County also hired an experienced pilot and gave him maps with the locations of beehives

9

so that he could turn off the sprayer when flying over those locations. The pilot testified to doing so.

Appellants argue that the death of the bees was nonetheless foreseeable because of an "explicit warning in the pesticide use instructions stating that dispersal of the substance is 'highly toxic' to bees." Appellants' Reply Br. 10 (citing J.A. 157). But this frames the foreseeability analysis too narrowly. The question is not simply whether applying the pesticide to bees would foreseeably result in their death, but rather, whether the bees would die despite the County's specific efforts to avoid exposing the bees to the pesticide. We conclude that it was not foreseeable that the press release would fail to reach Appellants, leaving Appellants and their bees unprepared for the spray. Appellants testified that they had previously successfully taken protective measures prior to sprays of which they were aware, such as closing the hive entrances and laying a damp bed sheets across the hives. Thus, previous sprays did not result in the death of Appellants' bees. And the fact that the spray in question was conducted aerially while previous sprays were conducted via truck is likewise not enough to conclude that the bees' death was foreseeable. This is because there is no evidence that Appellants' protective measures would have been ineffective in this instance had they known about the spray, especially given the pilot's effort to avoid direct exposure by turning off the sprayer. Indeed, this spray did not kill other local beekeepers' bees.

The death of Appellants' bees is undoubtedly a tragedy, but we cannot conclude that it was the foreseeable or probable result of the County's action when it is a clear outlier in terms of collateral damage arising out of the County's mosquito abatement effort.

10

Ultimately, because we conclude the death of Appellants' bees was neither intended nor foreseeable, the Takings Clause does not require compensation.

IV.

For the foregoing reasons, the decision of the district court is

*AFFIRMED*.

TRAXLER, Senior Circuit Judge, concurring:

Appellants Mitch Yawn and Juanita Stanley claim, in essence, that the death of their bees amounted to a taking by Dorchester County because the County forgot to call the Appellants personally to inform them about the impending aerial spraying, as it had done before other pesticide applications. However, "[a]ccidental, unintended injuries inflicted by governmental actors are treated as torts, not takings." *In re Chicago, Milwaukee, St. Paul & Pac. R. Co.*, 799 F.2d 317, 326 (7th Cir. 1986). Accordingly, I concur in the judgment affirming the district court's grant of summary judgment in favor of the County.

## I.

In 2016, Dorchester County conducted aerial pesticide spraying in an effort to prevent the spread of the Zika virus. The County followed all required protocols before conducting the aerial sprays, including notifying the public through press releases issued to local news outlets, including newspapers, television and radio stations, and social media platforms. Because pesticides can affect beneficial insects as well as mosquitos, the County gave the pilot a map marked with the location of the known beekeepers in the targeted area, and the pilot turned off the sprayer before flying over those areas. The County's prior practice with truck-based mosquito spraying was to also call all known beekeepers in the area to give them an additional, personal warning about the upcoming treatment. The County followed that practice before the aerial spray, but either neglected to call the Appellants or was unable to reach them. The Appellants were also unaware of the various public notices given by the County. They did not cover their hives or take other

12

precautionary steps before the aerial spraying, and their bees died.  Other beekeepers who took precautions before the spraying did not lose their colonies.

## II.

As the Supreme Court has made clear, claims of an unconstitutional taking are fact-specific and not amenable to many bright-line rules.  *See Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012) ("In view of the nearly infinite variety of ways in which government actions or regulations can affect property interests, the Court has recognized few invariable rules in this area.").  In cases like this one, involving the line between takings and torts, the analysis generally focuses on foreseeability.

"[A] property loss [is] compensable as a taking . . . when the government intends to invade a protected property interest or the asserted invasion is the direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action." *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003) (internal quotation marks omitted); *Columbia Basin Orchard v. United States*, 132 F. Supp. 707, 709 (Ct. Cl. 1955) (For property loss to amount to a taking, "[t]here must have been an intent on the part of the defendant to take plaintiff's property or an intention to do an act the natural consequence of which was to take its property"); *see Ark. Game & Fish*, 568 U.S. at 39 ("Also relevant to the takings inquiry is the degree to which the invasion is intended or is the foreseeable result of authorized government action.").  The Appellants do not contend that the County intentionally killed their bees; instead, they argue that, given the known toxicity to bees of the pesticide used, the deaths were the

foreseeable result of the authorized governmental action. In my view, that is not the correct approach to the issue.

For purposes of the foreseeability inquiry, "authorized" governmental action refers to governmental action that is "properly carried out." *In re Chicago, Milwaukee*, 799 F.2d at 326. Thus, the question is not whether it is generally foreseeable that pesticide might kill bees; the question is whether it was foreseeable that bees would die if the County *properly implemented* its aerial spraying plan.

> For example, if planes owned by the government regularly overfly a farm, causing the chickens to kill themselves in fright, this planned operation may "take" an easement across the farm. But if a stray military plane crashes into a chicken coop, killing an equal number of fowl, this is a tort rather than a taking. . . . [A] foul-up in the implementation of the program does not require compensation outside the scope of [any applicable Tort Claims Act].

*Id.*

In this case, the *authorized* governmental action was the aerial spraying of pesticides in a targeted area after the County (1) provided broadly aimed public notices of the operation; (2) provided the pilot with a map showing bee-keeping operations within the targeted area so the spraying could be stopped while flying over those areas; and (3) made personal phones calls to all known beekeepers to personally inform them of the operation. The death of bees would not be the natural consequence of that properly implemented plan, as demonstrated by the fact that Appellants had been able to protect their bees from earlier truck-based pesticide spraying and only the Appellants' bees were affected by the aerial spraying.

Because the death of Appellants' bees was not the natural consequence of the County's mosquito-control plan, there was no taking. While the County may have erred in the *implementation* of the plan by failing to personally call the Appellants, "the government is not absolutely liable for mistaken implementation of a [plan] that does not otherwise take property." *In re Chicago, Milwaukee*, 799 F.2d at 327; *see Sanguinetti v. United States*, 264 U.S. 146, 148-50 (1924) (concluding that government's construction of canal that caused flooding of neighboring property during periods of high rains was a tort, not a taking, where flooding occurred because engineers designing the canal relied on inaccurate information when determining the carrying capacity of the canal); *cf. Daniels v. Williams*, 474 U.S. 327, 328 (1986) ("We conclude that the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property."). At most, the County was negligent in its implementation of the mosquito-control plan, which limits the Appellants to any remedy available to them under South Carolina's Tort Claims Act.

### III.

Although the district court's approach to the takings claim was perhaps not as clear as it could have been, this court is not limited to the district court's reasoning when affirming the judgment. Because the death of their bees was not a natural or intended consequence of the County's mosquito-control plan, the Appellants' takings claim fails. I therefore concur in the majority's opinion affirming the district court's grant of summary judgment in favor of the County.