**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 20-2056**

_____

JOSEPH E. BLACKBURN, JR.; LINDA C. BLACKBURN, all similarly situated individuals,

Plaintiffs – Appellants,

v.

DARE COUNTY; TOWN OF NAGS HEAD; TOWN OF DUCK; TOWN OF KILL DEVIL HILLS; TOWN OF MANTEO; TOWN OF KITTY HAWK; TOWN OF SOUTHERN SHORES,

Defendants – Appellees.

_____

Appeal from the United States District Court for the Eastern District of North Carolina, at Elizabeth City. Louise W. Flanagan, District Judge. (2:20−cv−00027−FL)

_____

Argued: September 13, 2022                          Decided: January 25, 2023

_____

Before AGEE, RICHARDSON, and RUSHING, Circuit Judges.

_____

Affirmed by published opinion. Judge Richardson wrote the opinion, in which Judge Agee and Judge Rushing joined.

_____

**ARGUED:** Lloyd C. Smith Jr., Lloyd Clifton Smith, III, PRITCHETT & BURCH PLLC, Windsor, North Carolina, for Appellants. Brian Florencio Castro, WOMBLE BOND DICKINSON (US) LLP, Winston-Salem, North Carolina, for Appellees. **ON BRIEF:** S. Wade Yeoman, Corey Ann Finn, FINN AND YEOMAN, Louisville, Kentucky, for

Appellants.  Christopher J. Geis, WOMBLE BOND DICKINSON (US) LLP, Winston-Salem, North Carolina, for Appellees.

RICHARDSON, Circuit Judge:

Joseph Blackburn, Jr. and Linda Blackburn own a beach house in Dare County, North Carolina. In the early days of the COVID-19 pandemic, Dare County banned non-resident property owners from entering the county. As a result, the Blackburns could not reach their beach house for forty-five days. In response, they sued Dare County, alleging that their property was taken without compensation in violation of the Fifth Amendment. After the district court found that the ban was not a Fifth Amendment taking and dismissed the Blackburns' suit for failure to state a claim, the Blackburns appealed. But we affirm. The ban did not physically appropriate the Blackburns' beach house. And though it restricted their ability to use the house, compensation is not required under the ad hoc balancing test that determines the constitutionality of most use restrictions.

## I.      Background

In March 2020, Dare County's Board of Commissioners, like many governments across the country, enacted several public health restrictions to limit the spread of COVID-19. Dare County announced the restrictions on March 16 and implemented them over three phases. Phase one, which took effect immediately, declared a state of emergency and prohibited mass gatherings. Phase two, which took effect one day later, prohibited non-resident visitors from entering the county. Phase three, which took effect four days after the restrictions were announced, prohibited non-resident property owners from entering the county. In effect, Dare County told non-resident property owners: "If you want to quarantine at your beach house, get there by March 20." This gave non-resident property owners four days to travel to the county.

3

The Blackburns live in Richmond, Virginia. For whatever reason, they did not travel to their beach house by March 20 when the non-resident-property-owners ban took effect. So the Blackburns could not then access their beach house until the order was partially lifted forty-five days later.

The Blackburns responded by suing Dare County for violating the Fifth Amendment's Takings Clause.[1] They sought damages, both for themselves and for a putative class of other non-resident property owners. But the district court dismissed their suit for failure to state a claim. The Blackburns timely appealed, and we review that dismissal de novo. *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020).

## II.     Discussion

The Fifth Amendment's Takings Clause provides: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause aims to prevent the "Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

---

[1] The Blackburns did not bring a claim under the Privileges and Immunities Clause, which declares: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1. That clause prohibits discrimination against citizens of other states simply because they are citizens of other states. *Saenz v. Roe*, 526 U.S. 489, 502 (1999). And the Supreme Court has extended it to prohibit at least some county-residency requirements. *See United Bldg. & Constr. Trades Council v. Mayor & Council of Camden*, 465 U.S. 208, 215–18 (1984). Since the Blackburns chose to proceed solely under the Takings Clause, our analysis is limited to that claim.

4

The Supreme Court has said that, as originally understood, the Takings Clause was thought only to reach physical appropriations of property. *See Murr v. Wisconsin*, 137 S. Ct. 1933, 1942 (2017).[2] The rule for these physical appropriations is simple: compensation is always required. "When the government physically acquires private property for a public use [it] must pay for what it takes." *Cedar Point*, 141 S. Ct. at 2071. This is true whenever the government takes the property, by whatever means, whether for itself or for a third party. *Id.* at 2072. And a physical appropriation due to a government regulation is "no less a taking." *Id.*

For the past century, the Supreme Court has also recognized that the Takings Clause protects against restrictions on an owner's ability to use his property that "go[] too far." *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). If a use restriction denies the owner all economically beneficial use of the land, then the restriction has gone too far and—under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992)—the government has made a per se taking. *See id.* at 1015–19. But such restrictions are rare. *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 332 (2002). Instead, most use

---

[2] There has been some debate about what the original understanding of the Takings Clause was, and about how that should impact modern Fifth Amendment doctrine. *See, e.g.*, *Murr*, 137 S. Ct. at 1957–58 (Thomas, J., dissenting) (citing Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, but the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008)). But the Supreme Court has been clear that, while early understandings of the Takings Clause might have been limited to physical appropriations of property, that is no longer our law. *See Murr*, 137 S. Ct. at 1942; *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071–72 (2021).

5

restrictions are evaluated under a "flexible" balancing test to determine whether compensation is required. *Cedar Point*, 141 S. Ct. at 2072.[3] Laid out in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), this "essentially ad hoc, factual inquir[y]," asks us to examine (1) the "economic impact" of the use restriction, (2) how much the restriction interferes with "investment-backed expectations," and (3) "the character of the governmental action." *Id.* at 124.

The Blackburns allege that the order prohibiting non-resident property owners from entering Dare County meets each of the Supreme Court's takings tests. That is, they claim that the order was (1) a physical appropriation, (2) a use restriction amounting to a per se taking under *Lucas*, and (3) a taking under *Penn Central*'s balancing test. But they have failed to state a claim under any approach.

## A.    Physical Appropriation

The Blackburns first argue that the non-resident property order constitutes a physical appropriation. As explained above, this occurs when the government physically

---

[3] *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2022), changed the framework we use to evaluate Takings Clause claims. Before *Cedar Point*, takings were either "physical" or "regulatory." *See, e.g.*, *Md. Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 364–65 (4th Cir. 2020). Under the old regime, regulatory takings were generally evaluated under the *Penn Central* framework, unless "the regulation worked a permanent physical occupation" or "deprived the owner of all economically beneficial use of the land." Lee Anne Fennell, *Escape Room: Implicit Takings After* Cedar Point Nursery, 17 Duke J. Const. L. & Pub. Pol'y 1, 5–9 (2022). In the latter two cases, a per se taking occurred.

But the Court in *Cedar Point* rejected this framework. *See* 142 S. Ct. at 2071–72. It specifically noted that the regulatory-takings label "can mislead." *Id.* at 2072. So, taking the Court's guidance, we apply the physical-appropriation versus use-restriction dichotomy used in *Cedar Point. See McCutchen v. United States*, 14 F.4th 1355, 1363 (Fed. Cir. 2021) (adopting the new "physical appropriation" versus "use restriction" dichotomy).

appropriates private property for itself or a third party. *Cedar Point*, 141 S. Ct. at 2071. This is true no matter if the appropriation occurs through regulation or physical entry. *Id.* at 2072. But even accepting the Blackburns' allegations at face value, Dare County's non-resident property order did not physically appropriate anything from them. The order did not authorize government officials or third parties to physically occupy or possess the Blackburns' vacation home.

The Blackburns try to get around this problem by emphasizing that the non-resident property order effectively excludes them from their own property. This, they say, makes the order a physical appropriation, because the Supreme Court has repeatedly held that an appropriation occurs when the government eliminates a property owner's right to exclude. But temporarily excluding an owner from their own property differs from eliminating the owner's right to exclude. Indeed, the Supreme Court has stressed that, when asking if a physical appropriation has occurred, the "essential question" is "whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property." *Cedar Point*, 141 S. Ct. at 2072. By excluding the Blackburns' from their property, the order has "restricted [their] ability to use [their] own property." *Id.* But the order has not "physically taken" the property for the government or a third party. *Id.* Therefore, the district court properly held that the Blackburn's complaint failed to allege a physical appropriation.

### B.    *Lucas* Per Se Taking

The Blackburns next argue that the non-resident property order is a per se taking under *Lucas*. *Lucas* says that, while most use restrictions will be analyzed under *Penn*

*Central*'s three-factor test, that ad hoc inquiry is unnecessary when a use restriction "denies all economically beneficial or productive use of land." 505 U.S. at 1015. A use restriction that deprives owners of all economically valuable use of their property is per se a taking, and no further analysis is required.

But *Lucas*'s per se rule does not apply here. Accepting the allegations in the complaint as true, Dare County's order did not deprive the Blackburns' property of all economic value. The restriction was enacted under the County's State of Emergency declaration and so would only be operative while that state of emergency persisted. And it lasted only forty-five days. This "temporary prohibition" could not have rendered the Blackburns' property valueless. *See Tahoe-Sierra*, 535 U.S. at 332. Moreover, the Blackburns could have lived in their house so long as they arrived before the ban took effect. And even during the forty-five days that the ban lasted, they were still able to rent their property to someone within the County or certain adjoining counties. So the order was not a per se taking under the *Lucas* framework.

### C.     *Penn Central* Taking

The Blackburns are left with only *Penn Central*'s "ad hoc" balancing. 438 U.S. at 124. That balancing requires us to consider, at least, three factors of "particular significance": (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." *Id*. We look at each factor and then weigh them. After doing so, we conclude that the Blackburns have failed to plead a plausible *Penn Central* claim.

8

The first *Penn Central* factor—the economic impact of the regulation on the claimant—favors Dare County. Here, we weigh the diminution in value that the ban caused to the property against the value of the Blackburns' home unburdened by Dare County's order. *See, e.g.*, *Penn Cent.*, 438 U.S. at 130–31 (collecting cases); *see also* John D. Echeverria, *Making Sense of* Penn Central, 39 Env't L. Rep. News & Analysis 10471, 10474 (2009). In this Circuit, prevailing on this factor requires that a plaintiff allege that the challenged regulation caused a *substantial* diminution in value to the regulated property. *See Clayland Farms Enters., LLC v. Talbot Cnty.*, 987 F.3d 346, 354 (4th Cir. 2021) (holding that the first factor weighs against plaintiffs when they alleged only a 40% diminution in value).

The Blackburns have not met this standard. They pled no *facts* establishing a diminution in value, let alone a substantial one. Nor did they specifically allege the diminution in value caused by Dare County's order. And while that is not required under our pleading standards, they are required to allege facts that allow us to infer what diminution they suffered. *See ACA Fin. Guar. Corp. v. City of Buena Vista,* 917 F.3d 206, 212 (4th Cir. 2019).

The complaint is wholly lacking in this regard. The sole statement in the complaint about the economic impact of Dare County's order reads: "[t]he Plaintiffs, and other similarly situated non-resident property owners, have suffered damage by the temporary complete taking of their property as they have lost the fair market rental value and value of use of said property by governmental regulations for 45 days." J.A. 12; *see also* J.A. 15 (repeating this statement). But this is a legal conclusion, because it simply alleges that

9

there was a taking and then recites the standard for compensation.  *See First Eng. Evangelical Lutheran Church v. Los Angeles Cnty.*, 482 U.S. 304, 319, 322 (1987) (holding that the remedy for temporary takings is payment of fair market value of the property for the time the regulation was in effect).  Our pleading standards require more.  *See ACA Fin. Guar. Corp.*, 917 F.3d at 212 ("[S]imply reciting the cause of actions' elements and supporting them by conclusory statements does not meet the required standard."); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he pleading standard Rule 8 announces . . . demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.").  So the first factor cuts against the Blackburns.

The second *Penn Central* factor might slightly favor the Blackburns.  Under this factor, we examine "the extent to which the regulation has interfered with distinct investment-backed expectations."  *Penn Cent.*, 438 U.S. at 124.  These expectations must be founded "on a preexisting property right."  *Clayland Farms*, 987 F.3d at 354.  They must also be reasonable given the current use of the property.  *See Quinn v. Bd. of Cnty. Comm'rs*, 862 F.3d 433, 442–43 (4th Cir. 2017) (rejecting claims that there were reasonable investment-backed expectations where the investment was based on "speculative hopes" about whether the locality would install a sewer system); *Pulte Home Corp. v. Montgomery Cnty.*, 909 F.3d 685, 696 (4th Cir. 2018) (similar).

The Blackburns have a preexisting property right in their vacation home.  But even accepting their allegations, the non-resident property order did not deny the Blackburns the use of their vacation home.  It simply required them to be at their home by March 20, 2020, if they wanted to use it personally.  And the Blackburns remained free to rent the house to

10

those within the county, or to sell it. *Cf. Blackburn v. Dare Cnty.*, 486 F. Supp. 3d 988, 999 n.4 (E.D.N.C. 2020) ("Nowhere did the travel restriction in the instant case prohibit plaintiffs from using someone as an agent to exercise many of their rights of ownership during the 45-day period in which the regulation was in effect."). So even if the order interfered with an investment-backed expectation to personally use the beach house for the forty-five days it was in effect, that interference is not as significant as the Blackburns suggest.

The third *Penn Central* factor favors Dare County. This factor requires courts to examine "the character" of the use restriction. *Penn Cent.*, 438 U.S. at 124. Exactly what this factor refers to is, admittedly, a little fuzzy. *Penn Central* itself offered a glimpse at how a use restriction's "character" could be relevant: "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by the government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Id.* (cleaned up). But just four years later, the Supreme Court clarified that permanent physical invasions were per se takings, not subject to *Penn Central*'s balancing at all. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 (1982); *see also Horne v. Dep't of Agric.*, 576 U.S. 350, 357–58 (2015). So if permanent physical invasions are per se takings, what "character" merely *suggests* that a use restriction is a taking?

Rather than identify clear character traits, courts have treated this factor as an open-ended inquiry into whatever considerations they think are most relevant in each specific case. And recall that *Penn Central* is itself an "ad hoc, factual inquir[y]" with "few

11

invariable rules." *Penn Cent.*, 438 U.S. at 124. Combine an ad hoc balancing test with an open-ended factor and you're left with doctrine that is a "veritable mess." Echeverria, *supra*, at 10477.[4] But we must do our best.

Still, one principle—to the extent that it remains distinct from per se takings doctrine—is that we should seek to "identify regulatory actions that are functionally equivalent to the classic taking in which the government directly appropriates private property or ousts the owner from his domain." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 539 (2005); *Clayland Farms*, 987 F.3d at 355; *Henry v. Jefferson Cnty. Comm'n*, 637 F.3d 269, 277 (4th Cir. 2011).

Applying this principle suggests that the order is not a taking. Based on the allegations in the Blackburns' complaint, the order is not "functionally equivalent" to a government appropriation of private property. *See Clayland Farms*, 987 F.3d at 355. The Blackburns controlled their home during the entire time the order was in effect, and could have personally used it had they arrived in Dare County by March 20, 2020. *Cf. Horne*, 576 U.S. at 361–62 (holding that a physical appropriation occurred when a regulation physically transferred raisins from farmers to the government).

Nor is the order "functionally equivalent" to an ouster. *See Clayland Farms*, 978 F.3d at 355. The Blackburns were not dispossessed of their vacation home. And they were

---

[4] Our own precedent is largely unhelpful in this area. Most of our *Penn Central* cases deal with zoning decisions, a far cry from Dare County's order in this case. *See, e.g.*, *Clayland Farms*, 987 F.3d at 350; *Pulte*, 909 F.3d at 688–89; *Quinn*, 862 F.3d at 436–37.

never forced to leave Dare County.  In fact, just the opposite.  Despite promulgating the order on March 16 and implementing the non-resident visitor ban a day later, Dare County delayed implementing this order until March 20 to give homeowners like the Blackburns a chance to travel to the County.  This is a far cry from an ouster.  *See Ouster*, Black's Law Dictionary (11th ed. 2019) ("The wrongful dispossession or exclusion of someone (esp. a cotenant) from property.").

Another principle we can distill from the caselaw is that we should consider the distributional impact of the order.  All else being equal, a regulation is more problematic when it burdens only a small number of property owners.  *Cf. Armstrong*, 364 U.S. at 49.  Perhaps this is just another way to ask if the regulation looks more similar to a direct appropriation or practical ouster.  *See Lingle*, 544 U.S. at 537–40.  But however we examine this idea, it does little to advance the Blackburns' cause.

The Blackburns effectively conceded that the order is a broad-based regulation by filing their suit as a putative class action.  Class treatment is appropriate only when "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  So bringing a putative class action shows that the order was not narrowly targeted, and its burdens were distributed across the community.  In this sense, the order is like the landmark preservation law at issue in *Penn Central*, which the Court found unproblematic in part because it applied to "over 400 individual landmarks."  438 U.S. at 134.  The order here burdened non-resident property owners like the Blackburns.  But its impact was not limited to them.  Dare County's orders affected everyone in the community whose economic livelihood depended on non-residents.  So the burden here was widely distributed.

13

Similarly, any benefits from Dare County's order were also widely distributed, and included the Blackburns' property. The Supreme Court has suggested that a broad-based regulation is less likely to be a taking if it provides reciprocal benefits to the regulated parcel. *See Keystone Bituminous Coal. v. DeBenedictis*, 480 U.S. 470, 491 (1987). Even though the owner is burdened because the regulation limits the use of his own property, he benefits because the regulation also restricts the use of other nearby parcels. *See Penn. Coal*, 269 U.S. at 415–16, 422 (noting that average reciprocity of advantage can serve as a defense to takings liability).

The district court held that Dare County's order provided reciprocity of advantage because it reduced the spread of a "potentially life-threatening disease" and this was "a reciprocal public health benefit shared by residents and non-residents alike." *Blackburn*, 486 F. Supp. 3d at 1000. The Blackburns disagree, arguing that the order burdened only non-resident property owners like themselves because it effectively locked them out of the County. But the Blackburns misconstrue the order. The order did not "lock" non-resident property owners out of Dare County. In fact, Dare County delayed the implementation of the order to allow non-resident property owners like the Blackburns time to travel to their second homes. That the Blackburns chose not to avail themselves of the order's reciprocal benefits does not mean that the order lacked such benefits. So the Blackburns' contention that there is no reciprocity of advantage must be rejected.

14

In sum, Dare County's order is not the functional equivalent of a physical invasion or ouster. And its impact was distributed broadly. So we conclude that the third *Penn Central* factor cuts in Dare County's favor.[5]

Just as there is no clear guidance on what exactly the *Penn Central* factors encompass, there is no hard and fast way to weigh them. The most guidance we have received from the Supreme Court is its statement in *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528 (2005), that "the *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Id.* at 540. Yet however we stack its three factors up, the Blackburns have failed to plausibly state a claim for relief under *Penn Central*.

\* \* \*

Dare County's order restricted the Blackburns from using their property in many ways. But not every use restriction is a taking. And, properly viewed, Dare County's order is neither a physical appropriation, a use restriction that renders the property valueless, nor a taking under *Penn Central*. The effects of the order were temporary, the Blackburns had

---

[5] This is not to say, as Dare County tries to argue, that regulations under the police power are per se exempt from takings challenges. They are not. *Yawn v. Dorchester Cnty.*, 1 F.4th 191, 195 (4th Cir. 2021) ("That Government actions taken pursuant to the police power are not per se exempt from the Takings Clause is axiomatic in the Supreme Court's jurisprudence."). *Some* exercises of the police power are exempt from takings challenges. But only when they adhere to traditional common-law property principles. *Lucas*, 505 U.S. at 1028–1029; *Cedar Point*, 141 S. Ct. at 2079. Since the Blackburns' challenge fails to state a taking under any test, we need not and do not consider if Dare County's action followed these principles.

15

a chance to occupy their property before it took effect, and while the order was operative they could still exercise significant ownership rights over their property. The Blackburns' complaint therefore fails to state a plausible claim for relief, and the district court's decision is

*AFFIRMED.*